# Wheeling.

ANDERSON, &c. *v.* CRANMER *et al.*

(Absent, HAYMOND, JUDGE).

Decided November 17, 1877.

*1877.*
*Special Term.*

1. Mrs. A., the wife of A., deceased, as the next friend of her two infant children, only heirs-at-law of A., institutes a suit in chancery, to set aside a deed of trust, executed by A. in his lifetime to G. L. C., as trustee, to secure a debt due to C., on the ground that at the time the deed was executed, A. was insane. C. and G. L. C. were sworn as witnesses in their own behalf, and proved that at the time the deed was executed, they both being present, the said A. was of sound mind, and this opinion they base upon his conduct and conversation at the time and before. HELD :

    I. That under the second exception to section 2 of chapter 130 of the Code the evidence is inadmissible.

    II. That such witnesses under said exception were incompetent to give any opinions as to the grantor's sanity, based on any transaction or conversations had with him personally at that or any other time.

2. The point of time to be looked to by the court or jury, in determining the competency of a grantor to make a deed, is that, when the deed was executed ; but the condition of the grantor's mind, both before and after the execution of the deed, is proper to be considered, in determining what was his mental condition at the time the deed was executed.

3. The presumption of law is always in favor of the sanity, at the time the deed was executed, of a person whose deed is brought in question; and the burden of proof then lies upon him who asserts unsoundness of mind, unless a previous state of insanity has been established : in which case the burden is shifted to him, who claims under the deed.

4. The chancellor may, in the exercise of his discretion, either di-

rect an issue or refuse to do so; but this discretion. must be properly exercised; and a mistake in its exercise is just ground of appeal.

1877.
Special Term.

Anderson, &c.
v.
Cranmer *et al.*

5. Where there is such a conflict of evidence, that it is so nearly balanced, as to make it doubtful on which side is the preponderance, an issue ought to be directed; but where, though there be a conflict, it is not of such a character, no issue ought to be ordered.

6. Such doubt in the mind of the chancellor must not be a factitious but a reasonable one; justified by such conflict of the evidence.

7. Even after a verdict is rendered by a jury on an issue out of chancery, if upon the proofs, as they stood at the hearing, an issue ought not to have been ordered, it is the duty of the chancellor, notwithstanding the verdict, to set aside the order directing the issue, and enter a decree on the merits, as disclosed by the proofs on the hearing when the issue was ordered.

8. It is the duty of an appellate court in reviewing a decree founded on the verdict of a jury, rendered on an issue out of chancery, to look to the state of the proofs, at the time the issue was ordered; and if satisfied that the chancellor has improperly exercised his discretion in directing the issue, to render a decree, notwithstanding the verdict, according to the merits as disclosed by the proofs on the hearing, when the issue was ordered.

Appeal from, and *supersedeas* to, a decree of the circuit court of Ohio county, rendered on the 7th day of February 1876, in a cause in chancery, in said court then pending, wherein Mary Anderson, as next friend of John Anderson and Lavinia Anderson, was plaintiff, and Gibson L. Cranmer, Alexander Carson and Charles Watkins were defendants, allowed upon the petition of the said plaintiff below.

Hon. T. Melvin, Judge of the first judicial circuit, rendered the decree below.

JOHNSON, JUDGE, who delivered the opinion of the Court, furnishes the following statement of the case:

This is an appeal from a final decree, rendered by the circuit court of Ohio county on the 7th day of February

1876. The bill was filed on the 10th day of October 1874 by Mary Anderson, as mother and next friend of her infant children, John Anderson and Lavinia Anderson. The bill alleges that said infants are the children of said Mary and her husband, Samuel Anderson; that said Samuel died in the month of August 1873; that on the 7th day of May 1873, said Anderson conveyed lot No. 64 in Zane's addition to the city of Wheeling, to Gibson L. Cranmer, in trust, to secure to Alexander Carson the payment of a note of $1,152.00; that at the time of the making of said note and deed of trust, the said Samuel Anderson was, and had been for some time previous, notoriously insane; and he was shortly afterwards committed to the jail of Ohio county as a lunatic; that said Anderson never received any consideration for said note, or deed of trust; that said trustee had advertised the property for sale under said trust and was then crying the sale at the court house door. The bill prayed that the proper parties should be made defendants thereto and for an injunction to said sale.

On the same day the bill was sworn to; after which an amendment was made thereto, which showed, that since the bill was partly prepared, and the complainant was making every effort to complete it in time to prevent the sale, the said Gibson L. Cranmer, knowing of the intention of complainant to apply for an injunction, and desiring to hasten the sale, in order to complete it before the injunction could be obtained, sold the said property to Charles Watkins for $1,850.00; that said Watkins, Cranmer and Carson all knew of the insanity of Samuel Anderson at the time of making the said deed of trust; that the property is worth at least $3,000.00, and could have been made to bring much more than $1,800.00 had the sale not been unduly hastened. The prayer of the bill was that said Watkins also be made a party to the bill; that Cranmer might be enjoined from completing said sale, and said Watkins from paying him the purchase money; or if part of the purchase money had been paid,

that said Cranmer might be enjoined from paying it to Carson or any one else; that said deed of trust and the sale under it, be declared void; and for general relief. The bill was duly sworn to by the complainant.

On the 10th day of October 1874 the injunction was granted as prayed for. The deed of trust is filed as an exhibit with the bill, and shows it was acknowledged before the clerk of the county court on the day it bore date. The summons with the injunction indorsed thereon was duly served on all the defendants on the day it issued, to-wit: the 10th day of October 1874, the day the sale was made.

At December rules 1874 the defendant, Carson, filed his answer, in which he denies all the material allegations of the bill touching the insanity of Samuel Anderson, and the amount of consideration of the note secured by the deed of trust.

The defendant, G. L. Cranmer, filed his answer to the bill in court, in which he denies that Samuel Anderson was insane at the time the trust was executed; denies any undue haste in selling said property and denies that he knew at the time that an injunction was being obtained to restrain the selling of the same.

The defendant, Watkins, did not answer the bill.

On the 19th day of June 1875, " The case came on to be heard upon the process and return thereon, the bill taken for confessed as to Charles Watkins, the answer of Alexander Carson and Gibson L. Cranmer, the complainant's replications to said answers, and the depositions and exhibits heretofore filed in the cause. Upon consideration whereof the court doth order, that a jury be empaneled at the bar of the court, to ascertain and determine by their verdict the issue, whether at the time of making the deed of trust to Gibson L. Cranmer, on the 7th day of May 1873, Samuel Anderson, deceased, was of sane mind. On the trial of which issue the said Gibson L. Cranmer and Alexander Carson shall be plaintiffs, and the said Mary Anderson as next friend of John Ander-

son and Lavinia Anderson, infants, shall be defendants and on the trial of the said issue, the witnesses shall be produced in open court, except that the depositions of witnesses, who may at the time be out of the jurisdiction of this court or unable to attend, may be read. The said Cranmer and Carson by their solicitors except to the order of the court directing an issue in this cause, and the said Mary Anderson, as next friend as aforesaid, excepts to her being made defendant instead of plaintiff upon the trial of the said issue." On the 5th day of November 1875 a jury was impaneled to try said issue. On the 13th day of November 1875, the jury being unable to agree were discharged, and the cause continued.

On the 12th day of January 1876 another jury was impaneled to try the said issue. On the 17th of January 1876 the said jury rendered the following verdict: "We, the jury, find that Samuel Anderson, deceased, was on the 7th day of May 1873, the date of the execution of the deed in controversy, of sane mind."

On the 22d of January 1876 upon the court over-ruling a motion for a new trial, which had been made when the verdict was rendered, the plaintiff, as next friend, &c., by her counsel, moved the court to disregard the verdict of the jury, and decree according to the prayer of the bill, which the court refused to do.

On the 7th of February 1876 by a decree, that day rendered, the court dissolved the injunction and dismissed the bill. From and to this decree an appeal and *supersedeas* was allowed. At the time the issue was ordered the proof stood substantially as follows:

*For the Plaintiff.*

*George Spindler*—Was acquainted with grantee about six years, thought he was crazy; had been at work for him, and thought he was crazy from about the 1st of April 1873; continued working for him until in June; his reasons for his belief were: saw him many a time start to town with but one shoe on, and no coat or hat,

had to go and bring him back, would come for no one else; saw him also sharpening knives and hatchets; seldom saw him without a knife or hatchet in his hand; one time he wanted three or four to clear out a big piece of ground; said he wanted to plant five or six thousand bushels of potatoes, potatoes had all been planted at the time; one morning, before any of the rest got up, he came to town, Mr. Carson (one of defendants) and witness started in search, and found him in the market house, and took him home; talked about so much foolishness that witness can't remember any certain thing he then said; he used to be trying to make baskets with his knives and hatchets; often wanted witness to get up and go with him to dig for gold; said he had dreamed of where there were three big cans full; would wake witness up at two or three o'clock in the morning, and want him to go with him to help dig up the gold and bring it home; saw him daily while there; could not say exactly whether he was in town on the day the deed of trust was executed; one day saw Anderson and Carson come out of the court house; Anderson seemed pretty full; next day heard Anderson tell his wife he had given the deed of trust; when witness saw him at the court house was after he was crazy; was the 7th May before he died, that he saw him in the court house; witness saw him in jail, he was crazy; had no clothes on him; was all covered with filth; if Carson did not know he was crazy, he should have known it, for he was at his house often enough. Before the 7th May 1873, Anderson had shown before Carson that he was crazy; for Carson and witness slept together one night at Anderson's; Anderson got up and came to town, and Carson and witness came after him, and all the way in were talking about his craziness; when he was found he appeared to be wanting liquor, but had not found any. When he told Mrs. Anderson that he had made the deed of trust; she asked him what he had given it for; he said to save the property from McGeary; she said he had done wrong; he

said he thought he had his property safe from McGeary. On cross-examination, witness was asked to repeat the conversation he had with Carson; he replied he had sold Anderson a horse, and Carson was telling witness, that Anderson owed him a note of $900.00; said he wanted his own and no more from Anderson, and said he did not think Anderson was altogether right in his mind; the way witness remembered, that it was the 7th May 1873 he saw Anderson in town, was because he was a witness in a case in court, and the book showed it was that day.

*William Marshall*—Knew him for about two years before his death; in the spring before he died, was working with him putting up a fence; he was not in his right mind; he would lie right down on the ground, while we were working, and go to sleep several times a day; he talked curiously about the work, and had curious actions all the time.

*A. H. Patterson*—Knew him for three years; lived on farm of witness for more than a year; rented it for two years but he died before the time was out; saw him frequently; noticed something wrong with him about the commencement of the second year, the 1st of April; noticed about the 1st of April that his mind seemed to wander on different subjects; told witness about that time, he knew where there was some gold hid in the neighborhood of Elm Grove; would leave his work and go off without any particular object in view; told witness one day, the first part of May, he intended to clear off all the rough ground on the place and plant it in potatoes; at that time, potatoes had been planted; his insanity began to be spoken of in the latter part of April.

*Dr. W. A. Cracraft*—Was a practicing physician; had been practicing seven years; had known deceased since spring of 1872; had very few opportunities of seeing him, until he was sent for on the 15th or 16th of June 1873; was his family physician, and treated him for an eruptive disease and for nervousness arising from dissipation; when treating him for that, did not notice anything

wrong with his mind, more than the usual symptoms of dissipation, *nervousness* and *insomnia;* on the 16th of June, when witness went to see him, he was suffering from *acute mania,* and was insane; his condition was such that witness ordered a consultation at once; notified the deputy sheriff, as witness considered Anderson's family in danger; never noticed anything wrong with his mind in any conversation with him when witness had attended him previous to that time, though he may have been insane or monomaniacal; when witness went there on the 16th June, the first question he asked showed he was insane; did not know how long he had been insane before that; at that time he had acute mania; had no control over his will; the moment witness entered the room, saw he was in a very excitable condition; he said: "I want you to remain until I take the head off of my wife and put it on again;" he spoke of religious matters and money matters; the last time witness called to see him as a physician, previous to the 16th of June, was the 7th of February 1873; he was then troubled with an·eruptive disease; called at his house on the 1st of June, to see some members of his family, but had no conversation with him; never noticed any symptoms of insanity before the 16th, in his conversations with witness; in the manner in which he conversed in relation to his disease, he was not insane; witness had no reason to believe him insane until he was called there on the 16th of June 1873. The Doctor did not remember to have had any conversation with him from the time he treated him for the eruptive disease until the 16th of June 1873.

*Dr. E. A. Hildreth*—Was a physian of thirty-one years practice; last saw Anderson on the 24th day of May 1873, at that time thought he was of unsound mind. The incoherent character of his conversation led witness to believe his mind was unsound; he was affable enough to witness; said he had $7,000,000.00 in gold, of which he intended to give witness $1,000,000.00.

*Charles Allen*—A farmer, resided near Elm Grove; knew

72

*1877.
Special Term.*

Anderson, &c.,
v.
Cranmer *et al.*

Anderson for about eighteen months before he died; had noticed for some time, to the best of the knowledge of the witness, that Anderson was not in his right mind; noticed that he "talked very wild," in April 1873; was at his home one day and he had been to the spring house, and was coming up with a jar of milk and poured it out in a trough, and tried to catch the young ducks and put them in it; wanted witness to help him clear a lot of rough land he had on his place, told witness he wanted to put it in potatoes, told him it would be impossible to clear it that spring, said he did not think it would be much of a job, he had engaged George Spindler to help him, and if he could get witness, it would not take long to do it. That force could not have cleared the land in three years. One time he had been away from the house an hour or two, when he came back he had a lot of brush on his shoulders; asked him what he was going to do with it, said he was going to make a carriage out of it; was over there nearly every evening after he got bad, heard so much talk that it is impossible to repeat it, such talk was of the same character, that has been detailed. Had seen Mr. Anderson under the influence of liquor. He used to get drunk when he came to town most always. At the time spoken of, when his actions and conversations were such as has been described, did not think he was under the influence of liquor. Lived within about five hundred yards of him in 1872–3.

The plaintiffs proved by E. G. Cracraft, that Thomas McGeary instituted a suit for false imprisonment against Samuel Anderson in March 1873.

*Mary E. Marshall*—Lived at Elm Grove; had known Anderson for three or four years; did not think he " was rightly at himself" the last three or four times she was at his house; did not remember just when it was, but he was trying to make wagons and baskets out of bushes; it was early, about April, before moving time; this was the spring before he died; he told witness he had a gold mine which he was about to open, and he was going to

give witness an independent fortune. At another time witness went with him to Wheeling, at which time he sold a cow and calf; he was not fit, as witness thought, to drive a team, and others had to drive it; when he went to sell the cow, he said he would not take $100.00 for it; he sold her for $23.00; were to go out at twelve o'clock; waited for him until near night; he was not fit to drive in; he and Mr. Carson had been together, and he was very much intoxicated; that was the very day the trust was executed; the reason it would not do to let him drive, as they were going into town, was, that he run the horses, and did not seem capable to drive the team, Mrs. Anderson drove; he left Mrs. Anderson and witness at the upper market house; at that time he was not drunk; was about the 1st of April, he wanted to make wagons and baskets of bushes; Mrs. Anderson brought things to the market that morning; was in March he spoke of the gold mine; he never took charge of anything after his sickness in March.

The plaintiff also introduced Mrs. Mary Anderson and John, her son, for whose use the suit is prosecuted; and they were examined as to the condition of mind of the grantor, but as they are manifestly incompetent witnesses to speak of any transactions or communications had with him, he being dead, the substance even of their evidence will not be given.

The defendants took the deposition of Carson, the *cestui qui trust in the trust deed*, who was a brother-in-law of Anderson, and G. L. Cranmer, *trustee* in said deed, both defendants to the suit, and proved by them that on the day and at the time the deed of trust was executed, Samuel Anderson was of sound mind, and this opinion, expressed by both of them, was based upon the conversation had with said Anderson at the time, and his actions and conduct; and Carson was permitted to testify that he had had frequent conversations with him, and never had any reasons to believe him of unsound mind, until June 1873, when, from his conversation and ac-

1877.
Special Term.

Anderson, &c.,
v.
Cranmer et al.
tions, he thought his mind was not right; he also testified not only to conversations, had at the time the deed of trust was executed, but conversations, had before on that day; also to a conversation had with Anderson a week after the trust was executed, and relative thereto, in which he wanted him to cancel the trust because his wife was dissatified with it; he denied that he had talked with Spindler about Anderson being crazy, but admitted Spindler, on the occasion referred to in his deposition, told him about Anderson dreaming there was gold hid near Elm Grove; and denies that he met Spindler on the court house steps the day the deed was executed. The plaintiff objected to either Carson or Cranmer testifying to any transaction or conversation had with Samuel Anderson, deceased. The court did not decide the question as to whether they were competent to testify as to such matters.

The testimony of Robert Woods, the clerk of the county court, who took the acknowledgement of the deed, for some unaccountable reason to me, is not taken on either side. There is therefore no evidence as to the execution of the deed, except Cranmer and Anderson, and the fact that the deed was acknowledged.

The only other witness examined by the defendants on the question of sanity is *James A. Umplety*; "said he was at the time without an occupation ; was a brother-in-law of Anderson, having married his youngest sister; had known Anderson since 1863 ; saw him quite frequently ; saw him about a week before and a week after the deed was executed; after the deed was executed, saw him in town ; and he said his business in was to get the deed of trust cancelled, and to get security on the note, by his father; said he had trouble at home with his wife ; he said ' Jim, you know when Mary takes a notion about a thing, how determined she is,' and witness said ' I think I do know something about what a time she would make;' said his trouble with his wife was about giving the deed of trust on the property. Saw him

frequently in the spring of 1873. Last time witness saw him before he was committed to jail, was the time referred to when he wanted to have the deed cancelled. Before that day had heard that he was crazy, and tried every way to find out whether it was so; told him on that day what he had heard about him, and he laughed and said he was worried enough about this to set a man crazy. He drank a good deal, and witness saw him under the influence of liquor a great many times; but never saw anything that indicated insanity in him at all, so far as witness could see. Told witness frequently he owed Carson money, but never stated the amount. Anderson and his wife did not live very agreeably."

The deposition of John Anderson, a brother of deceased, was taken to show that Anderson was indebted to Carson. The above sets out the substance, of the testimony on either side relating to the question of insanity.

*Henry M. Russell* and *J. J. Woods,* for appellant.

1st. Appellant should have been made plaintiff in the issue, and should have had the right to open and close the case to the jury.

The general rule is the same in issues out of chancery, as in trials at law, that party upon whom burden of proof rests should be plaintiff: 2 Dan. Ch. Pr. 1096; 1 Greenl. Ev. §§74, 77. And the substance rather than the form of the issue will be considered: 1 Greenl. Ev. §74; *Soward* v. *Leggatt,* 7 Car. & P. 613. The rule in chancery is illustrated, but not decided, in *Smith* v. *Betty,* 11 Gratt. 752; *Henry* v. *Davis,* 7 W. Va. 715; *Eames* v. *Eames,* 16 Pick. 141.

The general burden of proof was on the appellant, as the party alleging insanity: *Burton* v. *Scott,* 3 Rand. 399; *Attorney General* v. *Parnther,* 3 Bro. C. C. 441; *Hall* v. *Warren,* 9 Ves. 605; *Jackson* v. *Van Dusen,* 5 Johns. 144.

No analogy can be drawn from the rule in issues *devasavit vel non,* for that rests on the peculiar rules brought

from the ecclesiastical courts: Code W. Va. chapter 77, §28; Redf. on Wills, 30 to 51; *Tatham* v. *Wright*, 2 Russ. & My. 1.

2d. The testimony of Carson and Cranmer, parties defendant, as to conversations and conduct of decedent, from which the witnesses were allowed to *give opinions as to sanity*, should have been excluded: Code W. Va. chapter 130, §23.

The meaning of "transactions and communications" illustrated: *Van Alstyne* v. *Van Alstyne*, 28 N. Y. 375; *Kerr* v. *McGuire, id.* 446; *Clark* v. *Smith*, 46 Barb. 30; *Dyer* v. *Dyer*, 48 Barb. 190; *Simons* v. *Sisson*, 26 N. Y. 264; *Lobdell* v. *Lobdell*, 36 N. Y. 327.

Evidence *tending to prove* a "transaction," cannot be given by a party: *Stanley* v. *Whitney*, 47 Barb. 586; *Strong* v. *Dean*, 55 Barb. 337; *Barrett* v. *Carter*, 3 Lans. N. Y. 68; *Latimer* v. *Sayre*, 45 Ga. 468.

That evidence offered was obnoxious to this objection: *Lee* v. *Dill*, 39 Barb. 516; *Timon* v. *Claffy*, 45 Barb. 438.

The precise question presented is decided with the appellant, in *Hatch* v. *Peugnet*, 64 Barb. 189.

3. On the facts of the case the chancellor, notwithstanding the verdict, should have decided for appellant.

Where general insanity is proved, the burden of proving a *lucid interval* falls upon the party alleging it, and a lucid interval is "not merely a cessation of the violent symptoms of the disorder, but a restoration of the faculties of the mind." No such such proof was made by appellees: Cases *supra* and *Clark* v. *Fisher*, 1 Paige 471 and S. C. concluded, 2 Comst. 498.

No appearance for appellees.

JOHNSON, JUDGE, delivered the opinion of the Court:

The first question presented is: Whether the defendants, Cranmer and Carson, were competent witnesses, to speak

as to the actions, or conversation of the grantor, or to give their opinions of his sanity at the time the deed was executed, founded upon such actions or conversations at the time of the execution of said deed, or at any other time. Section 23 of chapter 130 of the Code provides, that :

" A party to a civil action, suit or proceeding may be examined as a witness in his own behalf, or in behalf of any other party in the same manner, and subject to the same rules of examination as any other witness, except as follows :"

Then follow seven exceptions, the first and second of which are as follows :

" 1st. An assignor of a chose in action, shall not be examined in favor of his assignee, unless the opposite party be living.

" 2d. A party shall not be examined in his own behalf, in respect to any transaction or communication had personally with a deceased person, against parties who are the executors, administrators, heirs-at-law, next of kin, or assignees of such deceased person, where they have acquired title to the cause of action from or through such deceased person, or have been sued as such executors, administrators, heirs-at-law, next of kin, or assignees. But where such executors, administrators, heirs-at-law, next of kin, or assignees shall be examined on their own behalf in regard to any conversation or transaction with such deceased person, then the said assignor or party may be examined in regard to the same conversation or transaction."

This section was mainly taken from the New York Code of procedure, and a number of cases are found in the reports of the decisions of that state on the construction thereof. In *Clarke* v. *Smith*, 46 Barb. 30, the court held : " The Code, section 399, prohibits the examination of a party in respect to any transaction or communication, had by the party personally with a deceased person. The plaintiff was called to testify as to what took place

between him and the deceased, in regard to what she said as to his claims against her, and as to her paying his bill, and paying him money. It matters not whether the object of the testimony was to prove the affirmative or negative. It was to prove something between him and the deceased, about which she could have testified if alive, and the injustice of allowing a party to testify under such circumstances is apparent. It seems hard at first, that the plaintiff is not allowed to contradict the statements of the witnesses, who testified to what the deceased said on the subject, but there is in truth no hardship, because the law was not altered in this respect. Before the Code the plaintiff could not have been a witness at all, and so far as relates to transactions between the plaintiff and deceased, the law remains unaltered." *Van Alstyne* v. *Van Alstyne*, 28 N. Y. 375; *Kerr* v. *McGuire*, *ibid* 446; *Dyer* v. *Dyer*, 48 Barb. 190. In *Stanley* v. *Whitney*, 47 Barb. 586, the action was brought by an administrator, on a bond executed to the intestate by the defendant, conditioned for the payment of $907.49, with interest. The defense was usury; the answer alleging that the defendant executed a promissary note to the intestate for $986.00, which was usurious; and that the bond in question, and a mortgage accompanying the same, were given to take up the note, and as a substituted security for the original debt. In the court below the defendant was allowed to give evidence in his own behalf, that the only consideration he received for the note was the amount of $800.00, paid him by Rose. The supreme court held that the evidence was inadmissible, as it related to a transaction had with the deceased, and reversed the judgment and granted a new trial. *Strong* v. *Dean*, 55 Barb. 337.

In both the above cases the court held, that the test of the admissibility of the evidence is: "Does it tend to prove what the transaction was?" *John Timon* v. *Mary Claffey et al.*, 45 Barb. 438, was an action brought by the Roman Catholic Bishop of Buffalo, to establish a des-

troyed will, alleged to have been duly made by James Claffy. In the court below the plaintiff was offered as a witness in his own behalf, to prove conversations had between the plaintiff and the deceased, *at the time of making the will,* and before, on the subject of the will. The supreme court held that the evidence was inadmissible. In *Lee* v. *Dill,* 39 Barb. 516, was a contest as to the capacity of a testator, who was over ninety years of age, to make a will. Robert L. Dill was, in the court below, offered as a witness in his own behalf, and objected to as incompetent, and the objection overruled, and he was sworn and examined as a witness. In the course of his examination he was permitted to testify to conversations with the testator, material and relevant to the issue and tending to establish the will. The jury on the issue rendered a verdict in favor of said Dill. In the supreme court upon the hearing of the appeal had in the case, Allen, Judge, said : " Without referring in detail to the circumstances, which made the evidence objected to relevant and necessary on the part of Dill, it is sufficient to say it was regarded by him and was in truth important for him to prove, that the will was prepared from and in accordance with directions proceeding from the testator. Without such evidence it is probable, that a verdict would have been obtained affirming the will as the will of the deceased. The title of the claimant (Dill) was under the will, and all the negotiations and preparations, and all the circumstances between him and his father leading to and resulting in the will, were parts of the *res gestæ,* and entered into and made a part of the principal transaction, by which Mrs. Lee was to be deprived of her rights as heir-at-law and next of kin. And it follows that every part of this transaction, and every material circumstance must be proved by competent testimony."

It was held to be error to admit the evidence, and the verdict was set aside and a new trial granted.

In *Hatch* v. *Peugnet,* 64 Barb. 190, the judge in the inferior court admitted evidence to be given by the

plaintiff, Mrs. Hatch, a daughter of the testatrix of transactions and communications between the testatrix, Mrs. Hagan and the plaintiff; Mrs. Peugnet, was a legatee and executrix named in the said will, and such evidence tended to maintain the issue in favor of the plaintiff Mrs. Hatch, and against the defendant Mrs. Peugnet. It was objected by defendant's counsel, that such evidence was against the provisions of section 399 of the Code. Leonard, Judge, said: "The provisions of that section as amended in 1869 and in force at the time of the trial stripped of verbiage not applicable to this case are as follows : " No party to an action nor any person interested in the event thereof * * * shall be examined as a witness in regard to any personal transaction or communication between such witness and a person, at the time of such examination, deceased, * * against the executor or survivor, of such deceased person," * . * *.

The admission of the evidence of Mrs. Hatch, as to transactions and conversations between herself and her mother, were against Mrs. Peugnet, an executrix and legatee under the will in question. It was in clear disregard of the terms of the section of the Code above cited." We have but one case decided in our own State, giving a construction of the second exception to the provisions of our Code under consideration, and we think the decision is conclusive of the question. In *Calwell* v. *Prindle's adm'r, et al.*, decided at the last term at Charlestown ; he cause was an injunction by Calwell against A. F. Mathews, administrator of Prindle, to restrain him from selling property under a deed of trust, executed by Calwell to Mathews, trustee, to secure among others a debt to Prindle. In the suit Calwell was introduced as a witness in his own behalf, and was permitted to testify, that the debt secured by said trust to Prindle was evidenced by a note, and that he had paid the note and taken it up, and that it was lost. Judge Haymond, who

delivered the opinion of the Court, said: "That the payment of the note or bond by the plaintiff to Prindle, with the Thomas order, was a transaction had personally with Prindle, is manifest; and that the conversation between plaintiff and Prindle, then or before or afterwards, was a communication, had personally with Prindle, is equally clear; the execution and delivery by plaintiff of a note or bond to Prindle * * * was also a transaction had personally by plaintiff with Prindle, and the note or bond itself is and must necessarily constitute a part of that transaction, whether in the hands of Prindle or plaintiff. The obtaining of the note or bond by plaintiff from Prindle is also a transaction, had personally by plaintiff with Prindle, and the possession of the note or bond by plaintiff, after he had obtained it from Prindle, is necessarily a part of the transaction by which it was so obtained by plaintiff from Prindle. The one cannot be separated from the other, so as to render the plaintiff incompetent under the statute to testify as to the one fact, and competent to testify as to the other; and so the note or bond being in fact a transaction, had personally with Prindle by the plaintiff, it must follow that the plaintiff is not competent to testify as a witness on his own behalf as to any matter or thing, in relation to his possession or loss of said note or bond." It seems to me clear that Carson, the *cestui que trust* in said trust deed, is incompetent to testify as to any communication or conversation had with the deceased. The making of the deed of trust is itself a transaction, and he cannot be permitted to testify one word as to its execution. It seems to me it follows as a matter of course, if he could not be permitted to testify as to the conduct and conversation of the deceased at the time the deed was executed, he could not be permitted to give his opinion of the sanity of the grantor at the time the deed was executed, based upon such conduct and conversation. For if he was permitted to give his mere opinion as to the sanity of the grantor, the other party would certainly have

1877.
Special Term.

Anderson &c.
v.
Cranmer *et al.*

1877.
Special Term.

Anderson &c.
v.
Cranmer et al.
the right to show, on cross-examination, upon what facts that opinion was based, and would thus be compelled to have the very testimony before the court or jury, that the statute excludes, or be denied his right of cross-examination. The mere opinion of a witness to the sanity of a party is entitled to little or no regard, unless reasons be given, which would warrant the opinion. He could not speak at all as a witness in his own behalf as to the execution of the deed; and he surely could not give his opinion of the grantor's condition of mind, made up from the transaction itself. His opinion as to the sanity of the grantor, drawn from any transaction or conversation, had personally with him at the time of the execution of the deed, or at any other time, was clearly inadmissable.

Does G. L. Cranmer stand in any better position? His evidence is of the same character. He is the trustee. He certainly had an interest in the transaction; he was interested to the extent of his commissions, at least. The legal title to the property was in him; he had sold it as trustee, but had not completed the sale. He derived his interest in the trust deed in the same manner and from the same source, that Carson derived his, and it seems to me that the statute, that would exclude the evidence of Carson as to the transaction, conduct and conversation, would exclude that of Cranmer. I think therefore, that his evidence as to these matters was also inadmissible. The same character of evidence of Mrs. Anderson and her son John, was inadmissible for the same reasons.

How then did the proof stand at the time the issue was ordered? Anderson was a man who was in the habit of drinking. He was treated for an eruptive disease, and for his condition consequent upon his dissipation in February 1873, by Dr. Cracraft. George Spindler, William Marshall, A. H. Patterson, Charles Allen and Mary E. Marshall all testify clearly to acts and conversations of the deceased, occurring early in April

1873, and continuing until after the trust was executed, which acts and conversations are sufficient to show, that he had not mind sufficient to execute a deed, unless it was done in a lucid interval. Among the hallucinations he had, which most, if not all, the witnesses testify to, was that he thought he knew where there was gold in the neighborhood; and this idea was in his mind when Dr. Hildreth saw him on the 24th of May 1873, seventeen days after the deed was executed. The doctor gives that conversation about the gold, as one reason that convinced him that the man was insane. He said he had $7,000,000.00 dollars in gold, and proposed to give the doctor $1,000,000.00. Dr. Cracraft testifies that on the 16th day of June 1873 he was suffering from acute mania, and shortly thereafter he was confined to the jail of Ohio county as a lunatic, and died not long thereafter.

On the day the deed was executed, Mrs. Marshall came to the city with Mr. Anderson and his wife, and she said they could not trust him to drive, that he ran the horses, so that it was unsafe, and that he was not then under the influence of liquor.

We think the evidence clearly established general insanity in Anderson, before and continuing up to the time of the execution of the deed, and afterwards. The law presumes every man to be sane; but that presumption may be overthrown by proof; and in this case it is overthrown, not only by the opinion of the witnesses, but by the facts they relate, which are irreconcilable with sanity.

The presumption of law is always in favor of sanity, at the time the deed was executed, of a person whose deed is brought in question, and the burden of proof lies on him who asserts unsoundness of mind, unless a previous state of insanity has been established; in which case the burden is shifted to him who claims under the deed. There is but one witness who testifies to the sanity of the grantee shortly before the execution of the

deed; the burden of proof was clearly shifted to the party claiming under the deed. No competent witness has testified as to his condition at that particular time. It is then clearly established that at the time of the execution of the deed of trust by Samuel Anderson, on the 7th day of May 1873, he was not sane, and was therefore incapable of executing a valid deed.

Should the court then have directed the issue? It was clearly improper to have ordered the issue under the circumstances and legal proofs, as they existed at that time. The chancellor may in the exercise of his discretion, either direct an issue or refuse to do so; but this discretion must be properly exercised, and a mistake in its exercise is just ground of appeal.

When there is such a conflict of evidence, that it is so nearly balanced as to make it doubtful on which side is the preponderance, an issue ought to be directed; but where, though there be a conflict, it is not of such a character, no issue ought to be ordered. Such doubt in the mind of the chancellor must not be a factitious but a reasonable one, justified by such conflict of the evidence.

In this case the preponderance of the legal testimony was clearly against the sanity of the grantor, both before and after the execution of the deed; and no lucid interval at the time of the execution of said deed is proved; it was error therefore to have directed the issue. It was the duty of the chancellor to have disregarded the verdict of the jury, and to have set aside the order directing the issue, and to have entered a decree, upon the proofs as they stood at the time the issue was ordered. And it is the duty of the Appellate Court, in reviewing a decree founded on the verdict of a jury, rendered on an issue out of chancery, to look to the state of the proofs at the time the issue was ordered, and if satisfied that the chancellor has improperly exercised his discretion in directing the issue, to render a decree, notwithstanding the verdict, according to the merits, as disclosed

by the proofs on the hearing when the issue was ordered: *Jarretts* v. *Jarretts*, and cases there cited, *infra*, decided at the present term.

Therefore the decree of the 19th of June 1875, directing an issue in this cause, and also the decree of the 7th of February 1876, dissolving the injunction and dismissing the bill, must be reversed with costs to the appellants against the appellee Alexander Carson; and this Court, proceeding to render such decree, as the circuit court of Ohio county should have rendered; the deed of the 7th day of May 1873, executed by Samuel Anderson to G. L. Cranmer, trustee, is set aside, cancelled and annulled, and the injunction granted in this cause is perpetuated, with costs to the plaintiff against the defendant Alexander Carson; and it not appearing from the record whether the said defendant, Watkins, has paid any part of the purchase money, under the purchase at the trust sale, this cause is remanded to the said circuit court, with instructions to restore to Watkins the purchase money so paid, if any, and for further proceedings to be had therein, if necessary, according to the principles governing courts of equity.

JUDGES GREEN and MOORE concurred.

DECREE REVERSED, deed set aside and injunction perpetuated.