(Decided 28th June, 1870.)

JOHN CAIN, JOSEPH CAIN, DANIEL LARUE, and others, *vs.* ELISHA WARFORD, GEORGE M. GILL, and others.

*Mental weakness as affecting a Contract—Construction of a Contract.*

Feebleness of mind, in the absence of fraud or deception practised on the party in consequence of such infirmity, does not invalidate a contract.

Certain heirs-at-law and next of kin of Rachel Colvin appointed W, a special attorney to take the necessary steps to have her declared a lunatic; and he was empowered at the same time, in the event of her death intestate, to collect such shares of her estate as the parties might be entitled to, paying over to them, after deducting *necessary expenses*, one half, and retaining the other half for himself. Under proceedings instituted by another, Rachel Colvin was declared a lunatic. After her death, upon issues from the Orphans' Court of Baltimore City, a will of the testatrix dated in 1848 was established. Subsequently W, in prosecution of the arrangement made with him by the heirs and next of kin, employed D, an attorney at law, to institute and conduct an ejectment suit, contracting to pay him a fee of one half of what might be recovered of the shares, which he, W, represented or might thereafter represent. This suit resulted successfully. HELD:

That W, in his settlement with the heirs and next of kin by whom he was employed, was entitled to deduct the amount which he contracted to pay D, as a part of the *expenses necessary* for the recovery of their shares.

APPEAL from the Superior Court of Baltimore City, in Equity.

The bill of complaint in this case set forth that a certain Rachel Colvin being seized of a large real and personal estate, was for a long time prior to August, 1850, of an unsound mind, and continued so until she died; that on the representations of Elisha Warford, that it was necessary to take certain steps to establish the lunacy of the said Rachel, and to have a committee or trustee appointed to take charge of her person and manage her estate, and upon his offer that, for the hereinafter named consideration he would take the necessary steps to establish her lunacy and to obtain the appointment of a committee or trustee; and in case of her death intestate, that he would sue for and demand such shares as the complainants John and Joseph Cain, and Richard Cain, and Mary Larue, the two latter since deceased, might be entitled to as her heirs-at-law, and would reduce the same to possession, they, in connection with Daniel Larue, the husband of Mary, agreed to make and constitute him their attorney, and to give him one-half of their share as a remuneration for his labor, trouble and disbursements in carrying out the said objects, and as a fund to pay all expenses and lawyers' fees; except that the remaining half of the shares of these complainants were to defray their proportionate share of the expenses, meaning thereby legal taxed costs necessarily incurred for the recovery of the said shares; that accordingly John and Richard Cain severally executed his power of attorney; that Richard executed his power of attorney dated the 31st of August, 1850, of which Exhibit A was a copy, and at the same time received from the said Warford an instrument in writing, of which Exhibit B was a copy; that John, on the same day, executed a similar power of attorney, and received from the said Warford a contract containing the same provisions as Exhibit B; that the complainants Joseph Cain and Daniel Larue, together with his wife Mary, jointly executed a similar power of attorney, dated 7th of December, 1850, and received from the said Warford a contract similar to Exhibit B.

Exhibit A was an assignment to Warford, for the consideration of $1,000, of all the interest to which Richard Cain might become entitled as heir-at-law and next of kin to Rachel Colvin, in the event of her death intestate; and an obligation in such event, to make conveyances to said Warford of all of said interest; and also a power of attorney authorizing him to take all necessary measures to establish the lunacy of the said Rachel, and obtain the appointment of a committee or trustee to take charge of her person and property; and also to collect and give acquittances for whatever shares might be payable to the party executing said paper.

Exhibit B was an agreement of Warford to pay to Richard Cain "one-half of his share of said estate, deducting whatever expenses might be necessary for the recovery of said share, and if the said Warford should never receive any of said estate by virtue of the aforesaid power of attorney, then the said Cain should not receive or demand any moneys of the said Warford, but the said Warford agreed to clear him of any cost or expenses whatsoever concerning this matter."

The bill further charged that certain proceedings were instituted in the Orphans' Court of Baltimore city; and on the law side of the Superior Court a certain action of ejectment was brought, looking to the recognition of the rights of the complainants and others, in the real and personal estate of the deceased Rachel Colvin, which resulted in a compromise between Richard Colvin, the devisee under the pretended will of the said Rachel Colvin on the one hand, and her heirs-at-law on the other.

The bill further charged that the consideration expressed of $1,000 was nominal, and that the true object of said papers, Exhibits A and B, was to constitute Elisha Warford their attorney to defend their rights, and to agree to allow him one-half of their respective interests, which was to cover all his disbursements, except the mere *legal* expenses—that they executed said papers without the advice of counsel, whereas Elisha Warford acted under the advice of counsel,

and that he represented that these two Exhibits substantially contained the contract as set forth in the bill of complaint; that Warford claimed that these papers express a contract; that he was authorized to contract with and assign to G. L. Dulany, an attorney at law, in consideration of his retainer and professional services in representing and defending the interest of the heirs-at-law of Rachel Colvin, one-half of the whole right, title and interest of the heirs-at-law, and a moiety of the remaining half for his own compensation, so that the parties executing the powers of attorney are entitled to only one-fourth of their proper shares respectively.

The bill repudiated this claim, and insisted that the heirs-at-law were entitled to one-half of their respective interests, without abatement for counsel fees.

The bill further charged that Joseph Cain, one of the parties to the bill, was of a weak mind, and incapable of attending to business, except when aided by the counsel and assistance of friends; and that subsequent to his execution of the powers of attorney, he made an assignment of all his interest in Rachel Colvin's estate to said Warford.

The bill further charged that after a long series of litigation, Warford compromised the same by the execution of a deed of compromise between himself, acting under the aforesaid powers of attorney, and Richard Colvin, the devisee under the will of Rachel Colvin, by which deed they conveyed to G. M. Gill, F. W. Brune and Edmund Perry, certain property of which Rachel Colvin died seized, upon certain trusts and uses therein mentioned.

The bill prayed that the trustees be required to account to the complainants for one full moiety of their respective interests, free and discharged from any claim of said Warford—and that the accounts between the respective parties be adjusted on that basis.

The defendant, Warford, answered, claiming that by the true construction of Exhibits A and B, he was entitled to a moiety òf the shares, after Dulany's moiety was paid—and

denying that Joseph Cain was of weak mind, but admitting that he only paid him for his interest $500.

By agreement of counsel, the validity of the contract made by Elisha Warford with Grafton L. Dulany, or of the compromise made between Elisha Warford and Richard Colvin, was not contested, but the complainants denied the right of said Warford to claim a moiety of their interest, after deducting the interest conveyed and assigned to the said Dulany or the said Colvin, or the trustees as in said bill set out; Warford consented and agreed that the claim of the complainants, if properly maintainable, might be asserted and enforced against the property conveyed to the trustees.

Commissions were issued and testimony taken thereunder.

On final hearing, the following opinion was delivered, by Judge DOBBIN:

The object of the bill is to obtain from the Court instructions to the trustees, Messrs. Gill, Brune and Perry, to guide them in the distribution of the rents, issues and profits of the trust estate committed to them, till the *corpus* of the estate shall be distributed, and then in the distribution of that *corpus.*

It is not necessary for the purpose of this opinion, that I shall enter into a detailed statement of the pedigree of the parties, and the manner in which they came to claim or to own their respective shares, and as the validity of the contract made by Elisha Warford with Grafton L. Dulany, and of the compromise made between Elisha Warford and Richard Colvin are not disputed, the instructions now to be given as to the disputed points, will depend, first, upon the validity of the assignment of his interest by Joseph Cain to Elisha Warford, and secondly, upon the construction to be given to the assignments and powers of attorney, (Exhibit A,) by which Elisha Warford was made the active agent in the litigation, which grew out of the Colvin estate, and the contracts, (Exhibit B,) by which Warford agreed to pay to the

constituents of the powers the shares they were respectively to receive.

The validity of the assignment of Joseph Cain's interest, for the purpose of the anticipated litigation, is assailed upon the ground, that the consideration named in it, $1,000, was not in fact paid, and upon the further ground, that at the time he executed it, and at the time at which he executed the final assignment of his interest to Warford, as his own property, he was of weak and imbecile mind, and incapable of taking care of his interests in making a bargain.

The proof in the cause shows, that the assignment and power of attorney from Cain to Warford, and the contract of the same date, by which Warford bound himself to pay to Cain a part of the proceeds, which should result from the proposed litigation, made together one transaction, growing out of the following circumstances: Joseph Cain and a number of other persons, among whom was Elisha Warford himself, were the heirs and representatives of Rachel Colvin, who owned a large estate, and was incurably lunatic. It was obvious to them all, that upon her death, a great litigation would arise as to the distribution of her estate, and as the claimants in association with Warford, were numerous, scattered widely through the country, and all resident away from the scene of the expected litigation, the controversy could only be efficiently carried on by the agency of some one, who would, for an adequate remuneration, devote himself to the management of the case. This task, by bargain among them, was undertaken by Warford, and in order to put him in a condition to prosecute the affair advantageously, it was deemed expedient to give to him an assignment of their respective interests in the estate, accompanied with a power of attorney in the same instrument, to do whatever might be necessary for the end proposed, (Exhibit A,) and as the apparent effect of this assignment and power, would be to put the fund when collected, in the hands and power of Elisha Warford, they took from him a contract to pay to

them the share of the proceeds, which it was agreed they were to have, the rest to be retained by Warford for his compensation, (Exhibit B.) The consideration for the assignment and power was stated to be one thousand dollars, but as Warford was to retain only so much as was considered the equivalent for his labor and out-lay of money, the real consideration was that labor and out-lay of money.

In reference to the arrangement witnessed by these papers, no fraud is alleged in the bill, and certainly they are no more impaired by the fact, that the consideration was nominal, and was not pretended to have been actually paid, than a deed would be, which made a part of an honest and *bona fide* transaction, because it stated a nominal consideration of one dollar, which had not been in fact paid, and left the real consideration to be witnessed by the other papers in the transaction. If a deed be impeached for fraud, no consideration other than that named in the deed will be allowed to be proved, but if not so impeached, any additional consideration not inconsistent with that stated, may be alleged and proved in support of the deed. Here the additional consideration of labor, which is money's worth, and money itself to be expended, constitute a consideration perfectly consistent with that named in the assignment and power. I think, therefore, that upon the facts of this case, there is no weight to be given to the objection, that the thousand dollars was not in fact paid.

Upon the question of Joseph Cain's mental capacity to make a contract, I am of opinion that though the evidence is contradictory, the weight of it is in favor of his ability to contract. He seems to have been an illiterate and uncultivated man, and not of strong mind. But he had sense enough to marry and rear a family of children, and to make the ordinary bargains incident to his condition, and never has been placed under restraint as one unable to take care of himself. When all the functions of business and personal conduct are satisfactorily performed, according to one's station in life, Courts do not lightly pronounce a man mentally dis-

qualified with reference to a particular transaction. Now with respect to the general arrangement evidenced by the assignment and power of attorney, and the contract, he entered into it, in common with a number of others, about whose ability to take care of themselves there does not seem to be the slightest doubt. And as to the final purchase of Joseph Cain's interest for $500, I am of opinion that if he had mental capacity enough to deal with reference to it at all, and I think he had, the inadequacy of consideration furnishes no ground for avoiding the contract. Of the value of the possible interest he was selling, the law makes him the judge, and in estimating it now, long after events have ripened it into a reality, we must, as far as we can, look at it from the point of view from which Cain probably contemplated it, when it might well have been considered almost a forlorn hope.

The other question in the case is as to the construction to be put upon the contract from Elisha Warford to the complainants, filed with the bill as Exhibit B. That paper seems to me to admit of no other construction than that the phrase, "share of said estate," means, what came to Elisha Warford, upon the settlement or compromise with Richard Colvin, for that compromise stood in the place of an adjudication, by which one-half of the whole estate was decreed to Elisha Warford. Being then in his hands, as so much recoverd, he was to apply it, in the first instance, to the payment of the "expenses necessary for the recovery of said share," which expenses, included the portion Mr. Dulany was to have for his services, and what remained was to be divided into two equal parts, one of which was to be retained by Elisha Warford, and the other was to be divided among his constituents according to their respective interests.

My instructions therefore, to the trustees, are to divide the rents, issues and profits of the trust estate into two parts, one of which they will pay over to the representatives of the late Mr. Dulany; the other part they will again divide

into two portions, one of which they pay over to Elisha Warford, as the compensation, by the terms of the Contract B, for his labor and attention bestowed upon the litigation, whereby the trust fund was obtained, the residue they will divide into eight equal parts, one of which parts they will pay to the complainant, John Cain, and one other eighth to the complainants, Mary Larue's heirs, and one other eighth to the complainants, Richard Cain's heirs, one other eighth to the complainant, Anna Hudnot or her assigns, one other eighth to the defendant, Elisha Warford, in his own right, and the remaining three-eighths to Elisha Warford, the defendant, as assignee of the shares, respectively, of Joseph Cain, Walter McCann, and John Cain of Charles.

And when the time shall arrive, at which by the terms of the deed of trust the *corpus* of the estate shall be divided and paid over, they shall divide and pay over the said *corpus* in the proportions above mentioned.

And forasmuch as the purposes for which the said Elisha Warford received the assignment and powers of attorney, (Exhibit A,) have been gratified by the realization of the estate, the payments of the rents, issues and profits, and of the *corpus* of the estate, will be made directly to the complainants, (except Joseph Cain,) or their authorized agent or solicitor, and not through the hands of their former attorney in fact, Elisha Warford.

The Court thereupon passed a decree affirming the validity of the assignment and power of attorney marked Exhibit A, and the contract marked Exhibit B, and instructing the trustees to divide the trust estate in accordance with the foregoing opinion.

From this decree the present appeal was taken.

The cause was argued before BARTOL, C. J., STEWART, BRENT, GRASON, MILLER and ROBINSON, J.

*Wm. Meade Addison* and *Robert J. Brent,* for the appellants.

The exact question at issue can be seen by the following statement: Mrs. Dulany, the widow of G. L. Dulany, is entitled to one moiety, and the other moiety is to be divided into sixteen shares. It is conceded by both parties that Warford owns eight shares, and the complainants three shares, and hence five shares are in dispute. These five litigated shares arise thus: *Two shares* claimed both by Joseph Cain and Warford—*Three shares,* being one-half of the interest of the complainants or their ancestors, claimed both by them and by Warford.

The gist and substance of this suit is to instruct the trustees as to the disposal of the trust fund. Nothing is claimed against Warford, except so far as the instructions asked to be given to the trustees may affect him. The complainants stand in the attitude of parties alleging rights as to a trust fund, concerning which it is necessary for the Court to give directions to the trustees; and in this case the trustees ask to be protected.

The deed of trust refers to Elisha Warford as the assignee and attorney of the complainants; and the complainants come into Court to notify the trustees that the power of attorney of Warford does not give him the control over this fund as he claims, and they ask to be protected by the Court.

Two questions are involved:

First. Was the contract with Joseph Cain a valid contract? The complainants submit that the evidence establishes Joseph's imbecility of intellect, and that Warford took advantage of his weakness in the purchase of his interest. On 24th January, 1852, he bought Joseph Cain's interest for $500. And on the 11th of June, 1864, he bought John Cain's share for $1,250. The feeble state of Joseph's mind invalidates the contract. *Long vs. Long,* 9 *Md.,* 348; 1 *Story's Eq.,* 234, 5, 6, 7, 8.

The fiduciary relations existing between them avoids the contract between Warford and Joseph Cain. *Michaud vs.*

*Girod,* 4 *Howard,* 503; *Cumberland Coal and Iron Co.,* 20 *Md.,* 117; *Hoffman Steam Coal Co. vs. Cumberland Coal and Iron Co.,* 16 *Md.,* 456; *Brooks vs. Martin,* 2 *Wallace,* 70, 78, 84, 85; 1 *Story's Equ. Juris.,* 322, 323; *Fox vs. McCrath,* 1 *White & Tudor's Leading Cases,* 155.

The law, with wise forecast, seeing that where the relation of attorney and client, or agent and principal exists, the former has it in his power to take the latter at disadvantage in purchases and sales, provides that he shall derive no benefit to himself from such transaction, and superseding the necessity of proving what it would often be difficult to establish, requires the agent or attorney to establish the fairness and adequacy of the consideration. It also requires him to show that full information was given to the principal of every circumstance that would enable him to act intelligently and to his best interest. 1 *Story's Equ.,* 218, 219, 220, 310, 311, 322–3; *Brooks vs. Martin,* 2 *Wallace,* 84; *Hunter vs. Atkins,* 8 *Cond. Ch'y Rep.,* 497; *Michaud vs. Girod,* 4 *Howard,* 553–7; *Brock vs. Barns,* 40 *Barbour,* 521–8.

Elisha Warford having failed to offer any evidence whatever on these points, stands in the predicament of one guilty of a constructive fraud, and can take no advantage by his purchase.

Second. What is the true construction of the contract of Warford with the heirs?

The true construction of the contract is that Warford was to have but a moiety of what should be recovered, out of which he was to pay counsel fees. If the agreement was doubtful, it should be construed most strongly against Warford, for it is his obligation. *Buchanan's Lessee vs. Stewart,* 3 *H. & J.,* 329; *Howard vs. Rogers,* 4 *H. & J.,* 278; *Carroll's Lessee vs. Granite Manufacturing Co.,* 11 *Md.,* 411; *Ex Parte Plitt,* 2 *Wallace, Jr.,* 480.

*Wm. Henry Norris,* for the appellees.

BRENT, J., delivered the opinion of the Court.

There are three questions presented upon this appeal—the capacity of Joseph Cain to enter into a contract, the validity of the assignment made by him of his interest in the estate of Rachel Colvin, and the construction of the paper designated in the record as Exhibit B.

Upon these several questions, we think the law and facts are properly stated in the opinion of the Judge below.

The weight of evidence is very clearly in favor of the mental capacity of Joseph Cain to contract. That he was weak and feeble in mind, there is no doubt, but he is represented as attending to the ordinary affairs of life, making his own contracts in the community where he lives, and providing, in an humble manner it is true, for the support of a wife and children. In the absence of any proof of fraud or deception practised upon him in consequence of his weak mind, we cannot conclude that a contract with him is void because of a want of mental capacity to make it. In the assignment of his interest to Warford in 1852, the only circumstance which was relied upon to prove that undue advantage had been taken of his weakness, was the inadequacy of the consideration paid him. If grossly inadequate, it might lead to such a conclusion. But taking into consideration all the surrounding circumstances at the time the sale was made, we do not think the argument of the appellants' counsel upon this point is tenable. Rachel Colvin was then living, and although she had been declared a lunatic, the fact was disclosed in proceedings, growing out of her lunacy, for the appointment of a trustee and committee to take charge of her property and person; that she had made two wills, disposing of her property, in each one of them, to the exclusion of Joseph Cain. Not only was there a contingency that one of these wills might be established, but the contingency also existed that Joseph Cain might die before her, in which event his children, being grand-nephews, would receive nothing, even if she died intestate, or she might recover her sanity and make

a valid will still excluding him and his children. Under all the uncertainties of his interest (if he was to have any) in the estate of Rachel Colvin, we cannot conclude that the price paid for it by Warford was so small as to render the sale fraudulent and void.

When Warford made the purchase, he did not occupy such a fiduciary or confidential relation to Joseph Cain as to bring the transaction within the stringent rules of law regarding purchases by an agent from his principal, or attorney from his client, or trustee from his *cestui que trust.* By Exhibits A and B, which are to be construed together as forming one transaction between the parties, Warford was appointed special attorney to take such steps as might be necessary to declare Rachel Colvin a lunatic, and after her death he was empowered to collect such shares of her estate as the parties might be entitled to, paying over to them, after deducting expenses, one-half, and retaining the other half for himself. At the time of the purchase from Joseph Cain, the proceedings in lunacy were complete, and as Rachel Colvin was still living, no duties or powers had devolved upon Warford under the second part of the agreement or power of attorney. He cannot, therefore, be considered as occupying, at the time of the sale alluded to, any such fiduciary or confidential relations in the matter of the interest purchased by him, as to cast upon him the burden of proving that the transaction was free from suspicion, until at least a *prima facie* case of improper conduct on his part is made out by the complainants.

The next question is, whether, upon the construction of the paper referred to as Exhibit B, Warford is entitled to deduct from the gross shares of the heirs, the amount agreed by him to be paid to Mr. Dulany, for his services as an attorney in the *ejectment* suit, in which there was a recovery of the real estate left by Rachel Colvin. By the terms of this paper, "whatever expenses may be necessary for the recovery of said share," were to be deducted. What is to be considered as constituting *expenses,* will depend upon the particular circum-

stances of the case.    In *Brady vs. Dilly & Greenwade,* 27
*Md.,* 582, the proper and reasonable fees of an attorney were
held to be embraced in the term "expenses," it appearing that
his services were indispensable to the trustee in the proper dis-
charge of his trust.    In this case, the counsel for the com-
plainants, by their agreement in the record, do not contest the
validity of the contract made by Elisha Warford with Mr.
Dulany to pay him for his services, as an attorney, one-half
of the amount recovered, but it is insisted that it is not to be
deducted as a part of the expenses.    Before the institution of
the *ejectment* suit, the will of Rachel Colvin, upon issues from
the Orphans' Court, had been declared valid after a lengthy
and no doubt expensive trial.    These costs, and the necessary
employment of counsel, as nothing in that suit was recovered
by the heirs, had to be borne by Elisha Warford according
to the terms of his agreement.    Yet, notwithstanding the
will had been declared valid as to personalty, and was *prima
facie* valid as to realty, he instituted the *ejectment* suit in
behalf of the heirs who had appointed him their special
attorney, and employed Mr. Dulany to conduct it for a con-
tingent fee.    This suit resulted successfully, and Warford now
claims that the amount agreed to be paid to Mr. Dulany
should be considered, in his settlement with the heirs, as a
part of the "expenses necessary for the recovery of their
shares."    We think the circumstances of this case fully jus-
tify the conclusion, that it should be so considered.    That
the fee of Mr. Dulany was reasonable, has not been denied or
controverted in the argument.    To deduct it from the amount
coming to Elisha Warford, under the agreement he entered
into with the heirs, would be inequitable, as he would then
not only receive nothing for the labor and services which he
had given to this long and expensive litigation, but would be
left burdened with the costs and expenses he had incurred in
the first trial.

We do not understand that the compromise with Richard
Colvin is contested.    The amount, therefore, in the hands

of Elisha Warford for distribution is what he received under that compromise. The distribution of it is properly directed by the decree of the Court below, which we shall affirm.

*Decree affirmed and cause remanded*
*for further proceedings.*

(Decided 28th June, 1870 )