# CHARLESTON.

BUCKEY *v.* BUCKEY *et al.*

Submitted June 12, 1893.—Decided November 11, 1893.

1. DEED—CAPACITY—PRESUMPTIONS.
   The presumption of law is that the grantor in a deed was sane and competent to execute it at the time of its execution.

2. DEED—CAPACITY—EVIDENCE.
   Old age is not of itself sufficient evidence of incapacity to make a deed.

3. DEED—CAPACITY—EVIDENCE.
   The evidence of an officer taking the acknowledgment to a deed, or of a person present at its execution, is entitled to peculiar weight in considering the grantor's capacity.

4. DEED—CAPACITY.
   The time of the execution of the deed is the material or critical point of time to be considered upon the inquiry as to the grantor's capacity.

5. DEED—CAPACITY.
   A grantor in a deed may be extremely old, his understanding, memory, and mind enfeebled and weakened by age, and his action occasionally strange and eccentric, and he may not be able to transact many affairs of life, yet if age has not rendered him imbecile, so that he does not know the nature and effect of the deed, this does not invalidate the deed. If he be capable, at the time, to know the nature, character, and effect of the particular act, that is sufficient to sustain it.

L. D. STRADER, LELAND KITTLE, and JOHN BRANNON, for appellant, cited 11 W. Va. 584; 20 W. Va. 251; 20 Gratt. 147; 14 W. Va. 100–118.

DAYTON & DAYTON, W. L. KEE, and A. M. POUNDSTONE for appellee, cited 36 W. Va. 563.

BRANNON, JUDGE:

John J. Buckey brought three suits in equity in Ran-

dolph Circuit Court—one against Charles N. Buckey, to annul a deed made by George Buckey to Charles N. Buckey, and two against Alpheus, to annul two deeds made by George Buckey to Alpheus Buckey—and by a decree made in the three causes heard together the deed to Charles N. Buckey and one of the two made to Alpheus Buckey were annulled. Charles N. Buckey appeals. John J. Buckey in brief of counsel alleges error in the failure of the decree to cancel the other deed to Alpheus Buckey and asks that in that respect the decree be reversed.

The ground of attack upon these deeds is the incapacity of George Buckey from old age to make them. He died in 1888, aged ninety two years. On September 10, 1883, when eighty seven years old, he made a deed to Charles N. Buckey conveying about twenty acres of land, on which stood a mill, Charles N. Buckey being a grandchild, only son of Emmet Buckey. On September 15, 1880, George Buckey made to his son Alpheus a deed conveying to him a parcel of land embracing his residence and tanyard. On October 30, 1883, George Buckey conveyed to this same son, Alpheus, a parcel of seven acres of land and one half of two lots in the town of Beverly. These are the deeds assailed in said suits.

As it would answer no purpose of utility for future cases in a legal point of view, I shall not detail the many pages of evidence bearing on the mere question of fact of the mental capacity of George Buckey. George Buckey followed during a long life the business of a tanner. He was in business industrious, prudent and successful. He was moral and religious, bore a good character and, so far as I see, was of regular, plain, temperate habits. He was a man of decided intelligence and acquired a considerable property in real estate, though he was not wealthy. When he made these deeds, he had living four sons and four daughters and a grandson, the son of his dead son.

The evidence can not be said to conflict as to specific facts; but, in opinion as to George Buckey's mental capacity to transact business or make these deeds the numerous witnesses on the two sides widely differ. I can hardly say which on that subject might be said to have the pre-

ponderance. Perhaps in number there may be more on the side of his incapacity; but there are nearly as many on the other side; and when we look at the character of the evidence, the opportunity and means of observation, the business experience and capacity of the witnesses, and their ability to judge as to the party's competency, I am impressed that the evidence to sustain competency is preponderating in force and weight.

This is in my mind so, and would be most decidedly so, were it not for the evidence of Dr. George W. Yokum, a long time neighbor, family physician and intimate acquaintance of George Buckey, who is settled in opinion that he was incapable of making the deeds, because of "*senile dementia* intensified." But there is the son of Dr. George W. Yokum, Dr. Humboldt Yokum, a graduate of Jefferson Medical College, who from his childhood had known George Buckey, raised a close neighbor, seeing and conversing with him very often, and in July, 1882, made a settlement of his father's accounts with Buckey, and took Buckey's note for the balance, who expresses an opinion to the contrary. He is younger and less experienced than his father, it is true, but he seems intelligent and prudent in statement. I mention these witnesses because they are physicians, the only medical witnesses.

The list of witnesses upholding George Buckey's mental capacity includes the clerks of the two courts, a former sheriff, two attorneys, one of them a notary, all close neighbors and intimate acquaintances, whose business brought them in contact with all sorts of men and rendered their opinions of special weight, and who had had through years business with Buckey. A minister of the gospel, who was frequently at his house about the dates of the deeds and had business, social and religious conversation and intercourse with him, is also emphatic in favor of his competency. I have already said that there is very considerable opinion evidence to the contrary.

It is shown that in June, 1878, George Buckey's wife died, and it had a very depressing effect upon his mind. He said to his son-in-law, "I am in trouble; I don't know what to do." This is urged as a strong reason to impeach

the old man's competency. I regard it as not irrelevant but by no means of decisive or telling import. The loss in old age of the partner of a long life would naturally cast dark and lowering clouds over the old man's short remnant of life and render him oftentimes, when brooding over the change, vacant and oblivious to those things of the active, business world engaging the younger, but shut out at times from him. This would be the case with any of us. It is to be expected.

He did and said eccentric things. When his wife had been laid in her coffin for burial, he would have them to lay her on her side, and, a daughter having had the corpse changed back to its former position, he came into the room and did not seem to notice it.

He stated that he was in Washington and saw Guiteau and President Garfield, when the latter was dead, and that Guiteau was a bad looking man. He was not at Washington at all. This lamentable occurrence, the murder of President Garfield, possessed the mind of every person month after month during the illness of the president and the trial of his assassin. Is it strange that it engrossed this aged man's thoughts? It is an observed fact, entirely consistent with sufficiency of intellect to execute a valid deed, that the old frequently mistake fancy for reality, thinking they remember things never really in the memory as facts, but wholly the creation of imagination.

On one occasion, standing on the new bridge over Valley river he asked where the bridge was, and was told he was on it already, and that the old bridge had been burnt, when he remarked that he might find it further down the river, and went in search of it, soon returning, seeming to have recalled his recollection. He would sometimes be found sweeping out the old stable, saying he was going to stable horses in it, though it was disused and roofless, and supplanted by a new one near by. He remembered the old, familiar bridge and stable so fixed upon his memory through years long gone. They inhered in his memory yet, and overcame his recollection of the new. It is common —quite usual—for the aged to remember the impressions and things of their long ago, and forget for the time, until

they are specially recalled to their minds, recent occurrences.

Sometimes, though not often, this aged man would be found wandering listlessly, somewhat vacantly, about. his field near the town, and through the streets of the town of Beverly. There is nothing of much significance in this. He had for years labored in this field and walked the village streets among his neighbors, and he was still following his old walks and habits. When thus walking on one occasion, when his family wished him to come in, he became petulant, seeming to resent, as old people sometimes do, any hint that he was not himself as in days gone by. On another occasion he was found cutting weeds on the opposite side of the street from his house, seeming not to know it, and, when his attention was called to it, he at once returned across the street.

He sometimes bade a colored woman living in his house good-bye, saying he was going to Frederick City, and then go to the tanyard and return. Sometimes he would tell her when it was raining to take the doors from the outhouses; that they would get wet. At times he would talk incoherently, especially in later years, after these deeds were made, and in an instance or two failed to recognize an old acquaintance, but his sight was bad, and this is common in age. When he was told who the person was, he seemed to sharply recall him, saying, "Why, is this Arch Chenowith?"

I have given succinctly the chief part, if not all, of the peculiar conduct of George Buckey, summoned in aid of the effort to overthrow his capacity. Strange conduct we may say it is. Eccentricity, or rather the idiosyncrasies of this particular person they are, indicating, we may admit, failing powers under the hand of years of one who had walked so far down the other side of the hill of life; but with all this there is evidence to show continued good sense, intelligent conversation and discrimination, while the conduct above spoken of is occasional only.

The strange actions just mentioned do not go far enough ; they do not drown the excellent intelligence and common sense, the industry and careful earning and management

of property, which characterized his long life. They do not deprive this sensible, worthy man of the right to bestow his property as he wished. Here we must remember certain legal principles. Amid all this evidence, *pro* and *contra*, they come in with the force of a casting vote and sustain the validity of these deeds.

If we look anywhere we shall find it laid down as law, particularly in *Jarrett* v. *Jarrett*, 11 W. Va. 584, and *Kerr* v. *Lunsford*, 31 W. Va. 661 (8 S. E. Rep. 493) that "old age is not in itself sufficient evidence of incapacity to make a deed;" and that the presumption of law is always in favor of the sanity, at the time the deed was executed, of a person whose deed is brought in question ; the burden of proof is on him who asserts insanity, unless a previous condition of insanity has been established. *Jarrett* v. *Jarrett*, *supra*; *Anderson* v. *Cranmer*, 11 W. Va. 562, 584; *Hiett* v. *Shull*, 36 W. Va. 563 (15 S. E. Rep. 146).

"This presumption is universal, and is not defeated by common report or reputation, or the imputation of friends or relatives, or the old age or feebleness of the subject, or, in short, by any cause except controlling evidence produced." Busw. Insan. § 159.

The principle is sound in itself, and settled as a rule, that, in the absence of fraud, imposition, or undue influence, mere weakness or feebleness of understanding is not sufficient to overthrow the party's deed. *Aiman* v. *Stout*, 42 Pa. St. 114 ; *Cain* v. *Warford*, 33 Md. 23 ; *Miller* v. *Craig*, 36 Ill. 109 ; *Maddox* v. *Simmons*, 31 Ga. 512, 528 ; 2 Lomax, Dig. 298 ; Chancellor KENT, in *Van Alst* v. *Hunter*, 5 Johns. Ch'y 160.

Here I will say that no evidence shows, or tends to show, any fraud, undue influence, or even importunity on the part of these grantees. Though alleged in the bills, there is not the slightest proof and no contention of that kind is in the brief of counsel.

The mental weakness must go further than it does in this case. The mysterious action of the person, whose act was involved in *Mercer* v. *Kelso*, 4 Gratt. 106, went beyond that in this case. "No degree of physical or mental imbecility, which does not deprive the party of legal competen-

cy to act, is of itself sufficient to avoid his contract." *Farn-ham* v. *Brooks*, 9 Pick. 212. It must go so far as to disable him from knowing and understanding the nature and effect of his act. 2 Minor Inst. 572; Bish. Cont. § 962. His mind may be weak and debilitated as compared with what it once was, the memory enfeebled, the understanding be weak, the character and demeanor eccentric, and he may not have capacity to transact all the ordinary business of life; still, if he understands the nature of the act he does, recollects the property he is disposing of, and the person to whom he grants it, and how he desires to dispose of it, his act is valid. *Nicholas* v. *Kershner*, 20 W. Va. 251; *Kerr* v. *Lunsford*, 31 W. Va. 662 (8 S. E. Rep. 493).

The case shows, that most of all things, George Buckey remembered his property. This is both likely and appears in the case. As showing that he knew his property and the objects of his bounty and the nature of his acts, these deeds do not reflect the scheme of Alpheus and Charles N. Buckey, but the sedate and deliberate and long-entertained design of George Buckey himself. Time and again for twenty five years before these deeds he had said he intended to give his home property to Alpheus, and the mill property to Emmet Buckey. These declarations are admissible on the question of competency (*Dinges* v. *Branson*, 14 W. Va. 100–118) and tend to show capacity (Whart. & S. Med. Jur. § 87). If crazy, he wonderfully retained, and finally executed to the letter, his long-contemplated purpose. He said he intended to keep Alpheus with him as long as he lived; that Alpheus was kind and good to him. Alpheus remained with him till his death, while all the other children went off to do for themselves. He stated that Alpheus had lived with and cared for him all his life. He advanced to his other children or most of them considerable amounts; and he left outside these conveyances, a farm and other real estate of considerable value.

As further showing strongly that he knew what he was doing, witness his caution as to the mill property. Many years before he placed Emmet in possession of it, and he carried on milling business there, and George Buckey always declared he intended the mill for him. About one

year before the deed was made, the old man spoke to Mr. Jones about drawing the deed, but told him he wanted to run lines between this mill tract and one adjoining, and engaged to meet and met Jones on the ground, had the surveying done preparatory to the deed, and directed what land was to go into it. He at first said he intended to make the deed to Emmet; but Emmet became embarrassed financially, and with some reluctance in a deliberate conversation with Jones he at last determined to make the deed to Emmet's only son Charles N., saying he had been a good boy and had been of great service to him. When the deed was read he declared it correct. He had Mr. Wilson write one of the deeds he made to Alpheus, and a deed conveying two lots to a daughter, Mrs. Currence. He asked Wilson if he had the calls, and, he replying that he had not, he told who had conveyed the property, so that he could from the conveyance get the calls. Wilson suggested that he change his plan as to what lots he would convey to Mrs. Currence and what to Alpheus, but he refused to depart from his plan, giving good reason for his refusal.

And observe the prudence, favoring his own safety, evinced by the deeds themselves. The deed to Charles N. Buckey and that to Alpheus for the tanyard and home reserve a life estate and full control to George Buckey for his life; and in the other deed to Alpheus he made a charge of two hundred and fifty dollars in favor of another son, Marteny, who he said had not received much.

Another consideration is of great weight in favor of George Buckey's capacity. The two notaries who took his acknowledgments state that he was competent to make the deeds. There is no showing by any one present at their execution that at that time he was not competent. It has been often laid down that the very time of the *factum* of a deed is the critical point of time for inquiry as to the capacity of the party making it. "The evidence of witnesses present at the execution of a deed is entitled to peculiar weight." *Jarrett* v. *Jarrett*, 11 W. Va. 584; *Anderson* v. *Cranmer*, *Id.* 562; *Nicholas* v. *Kershner*, 20 W. Va. 251; *Beverley* v. *Walden*, 20 Gratt. 147, 158. In *Beckwith* v. *Butler*, 1 Wash. (Va.) 286, it was held that the evidence of

the subscribing witness as to competency to make a deed was "chiefly to be regarded;" and President PENDLETON spoke approvingly of a case in the Virginia Court of Appeals, where it overcame all other testimony before and after execution of the will.

No taint or savor of incapacity is imputed to George Buckey save on account of old age. It has become quite common for interested relatives to assail the disposition made by aged persons of their property. He gave to Alpheus Buckey and Emmet's son and perhaps Mrs. Currence, because he had not advanced them, and because they had remained near him and with him many years after they had become adult, while others had gone far away. They had done much to rock the cradle of reposing age. He said so on many occasions, especially as to Alpheus. Whar. & S. Med. Jur. § 87, warns us "that great caution, indeed, should be used, lest the existence of extreme old age should lead the medical witness to presume consequent imbecility." Chancellor KENT said in *Van Alst* v. *Hunter*, 5 Johns, Ch. 190 : "It is one of the painful consequences of extreme old age that it ceases to excite interest, and is apt to be left solitary and neglected. The control which the law still gives to a man over the disposal of his property is one of the most efficient means which he has in protracted life to command the attentions due to his infirmities. The will of such an aged man ought to be regarded with great tenderness, when it appears not to have been procured by fraudulent arts. but contains those very dispositions which the circumstances of his situation and the course of natural affection dictated."

Our conclusion is to reverse so much of the decrees as annuls the deed to Charles N. Buckey, and dismiss the bills filed to annul it, and to refuse to reverse, but, on the contrary, to affirm, that portion of the decree in the first case dismissing the bill filed by John J. Buckey to annul the deed to Alpheus Buckey, dated September 15, 1880.