# CHARLESTON

## WOODVILLE *v.* WOODVILLE.

Submitted November 26, 1907.   Decided January 14, 1908.

1. APPEAL—*Incompetency of Witness—Objections Not Made Below.*

   Objection to testimony for incompetency of a witness may be made in this Court, and it is not essential thereto that objection for such incompetency was made in and acted upon by the court below.   (p. 289.)

2. DEED—*Capacity of Grantor.*

   Courts do not measure capacities of persons nor examine into the wisdom and prudence of their property dispositions.  If one be legally *compos mentis,* be he wise or unwise, he is the disposer of his own property, and his will stands as a reason for his actions.  The test of legal capacity is that one is capable of recollecting the property he is about to dispose of, the manner of distributing it, and the objects of his bounty.  (pp. 290, 291.)

3. SAME—*Incapacity—Evidence.*

   Mere infirmity of mind and body is not sufficient to overcome the legal presumption of mental capacity in a grantor in a deed.  In order to have much effect, the evidence must show that he did not have sufficient understanding to comprehend clearly the nature of the business he was transacting.  (pp. 291, 293.)

4. SAME—*Time as to Grantor's Capacity.*

   The time of the execution of a deed is the material or critical point of time to be considered upon the inquiry as to the grantor's capacity to make the deed.  (pp. 291, 293.)

5. SAME—*Undue Influence.*

   To set aside a deed for undue influence, it must appear that the influence was such as wholly to destroy the free agency of the grantor, and to substitute the will of another for his; and unless such taking away of free agency appears, the showing of a motive and an opportunity to exert such undue influence, together with failing mental powers of the grantor, are not sufficient to overthrow the deed.  (pp. 294, 295.)

Appeal from Circuit Court, Monroe County.

Bill by James L. Woodville against Cary Breckenridge Woodville and others.  Decree for plaintiff, and defendant Cary Breckenridge Woodville appeals.

*Reversed.   Bill Dismissed.*

J. W. Marshall, Henry Gilmer, J. D. Logan, and Brown, Jackson & Knight, for appellant.

John Osborne and Mollohan, McClintic & Mathews, for appellee.

Robinson, Judge:

This suit calls into question the validity of a deed made by Dr. James L. Woodville to his son, Cary Breckenridge Woodville, on April 10, 1902, conveying the greater portion of the lands owned by the grantor, to the exclusion of his other children, it being alleged that such deed was obtained by undue influence. It is a suit of brother against brother, instituted after the death of the grantor. The circuit court held for the plaintiff, decreeing that the deed was made by reason of undue influence, and setting the same aside, and the grantee has appealed.

The grantor was a man eighty-two years and more of age, having resided and practiced as a physician at the old Sweet Springs, in Monroe county, for many years. He was of more than ordinary intelligence, and a prominent personage in that section. He had acquired, in the course of years, a valuable estate of about fifteen hundred acres, known as Glencary. From this estate the said deed conveyed between seven hundred and eight hundred acres, of which one hundred acres were conveyed in fee, a life estate being reserved in the residue by the grantor. At the time of such conveyance, the grantee was the only one of the children of this old gentleman that remained with him, all the others, three men and three women, had sought fortune for themselves, or, for some reason, had deserted the old home and the duties and responsibilities of taking care of their aged parent and extending to him love and helpfulness in life's eventide. The mother had departed this life many years before, and for more than ten years the son, Cary, had steadfastly remained with his father on the old place, being his sole family companion after the marriage and removal therefrom of one of the daughters who had remained with them for a time.

Prior to making said deed, this old gentleman had, with his own hand, made a will, devising to the said son, Cary, practically the same portion of the lands, one draft of

such will, dated October 22, 1901, having certain interlineations in it, or riders attached thereto; and, thereafter, a second draft, or complete and regular copy thereof was made by him on November 5, 1901. The first of these was deposited with a custodian, and the other was found among testator's personal effects after his death. It is significant to note that said will contained the following recitals: "I bequeath to my son, Cary B. Woodville, a larger portion of my landed property than to any other of my legatees. This is done in consideration of the fact that he is the only one of my children who has remained with me all the time, and sacrificed his prospects in life to promote my happiness and interest;" and, "should any of my legatees feel aggrieved at the disposition of my property and attempt to alter the same by an appeal to the courts, then any heir so offending to forfeit his or her portion to the heirs who obey without murmur the conditions of my will." And it is equally significant to note that the said deed expressed the following: "In the additional and further consideration of the affectionate and dutiful regard for said party of the first part as a parent, rendering said party of the first part, aid and comfort in old age, without any fixed pecuniary compensation."

It is shown that on an adjoining estate, known as Lynnside, lived the Lewis family, kinsfolk of the Woodvilles, and a daughter, an accomplished lady, educated by an uncle living in Richmond, was paid court by Cary B. Woodville, but she declined to marry him because of the objection of the uncle, who desired that she marry not a poor man; and plaintiff alleges that, because of this, the old man was importuned to provide for said son an estate, and thereby remove the objections to marriage; that, yielding to such importunities, the said will was made, but that the uncle, being informed thereof, was not satisfied therewith, and that thereafter the said deed was procured and the marriage consummated. Much reliance is placed upon this state of facts by the plaintiff and his brothers and sisters who join in the prayer of the bill, and upon the statements contained in the answer of said grantee in relation to the same.

While it is true that there was intimacy between the Lewis

and Woodville families, and that in his latter days, in his loneliness, enjoying no companionship but that of his son, and, after his connection as resident physician at the Springs had ended, much of the old gentleman's time was spent at Lynnside; yet, as this was but natural under the circumstances, and in no way inconsistent with pure motives on behalf of those interested, or the validity of the said deed, and the evidence failing to present a different view of such intercourse, we need not encumber this opinion with much that has been said relative to this intimacy and companionship between the two families. We may as well come speedily to the point in the case. To rehearse a great deal of the facts will be of no utility in future cases. Already has precedent been established by leading cases involving similar circumstances. Reiteration cannot be of service in the Reports.

The depositions of sons and daughters attacking this conveyance, the husband of one, and the wife of another, appear in the case, and eliminating the testimony of these interested persons in relation to personal transactions and communications with the deceased grantor, as we are compelled to do, but little, in fact, nothing, is left upon which plaintiff's case can stand. Extended argument has been submitted on the point that objection to this testimony, for such incompetency of the witnesses, should not avail in this Court, since exception thereto for such cause does not appear to have been passed upon by the court below. But the rule has long been established otherwise. *Rose* v. *Brown*, 11 W. Va. 122; *Martin* v. *Smith*, 25 W. Va. 579; *Kimmel* v. *Shroyer*, 28 W. Va. 505; *Long* v. *Perine*, 41 W. Va. 314; and other cases. We need not hesitate to say that, waiving the question of incompetency of these witnesses, and reading their testimony with all other proof in the case, it is plainly insufficient to sustain the finding of undue influence and the decree of the circuit court annulling the deed. Such decree is without sufficient and proper evidence to support it; and is plainly at variance with the well established principles relating to such cases enunciated in former opinions of this Court. *Buckey* v. *Buckey*, 38 W. Va. 168; *Delaplain* v. *Grubb*, 44 W. Va. 613; *Farnsworth* v. *Noffsinger*, 46 W. Va. 410; *Teter* v. *Teter*, 59 W. Va. 449; and similar cases.

Take the whole of the evidence, competent and incompetent, and what does it prove? Surely nothing directly as to undue influence. What circumstantially or inferentially? Nothing weighty enough to overthrow the deed. What is relied upon in this proof? Mere weakness in the grantor of body and mind, that of the latter not proved by a preponderance of the testimony by any means, if indeed not wholly refuted by the testimony of those having transactions with him, as well as by the strong and convincing evidence of capacity appearing from the papers and writings exhibited as made by this grantor near the time of the execution of the deed in question. With this theory of old age and accompanying mental weakness, plaintiff and his colleagues rely upon the circumstances of the intimacy between the Lewis family and Dr. Woodville and his son Cary, and the desire of the young people to be in a financial position to overcome the objections of the uncle to their marriage. But mark you, granting, if we could in the face of strong proof, the mental weakness, nothing but the mere circumstance of this close intimacy and the courtship and approaching marriage, together with the other mere circumstance of the faithful companionship of the son with the father, can be found to support undue influence. Not a witness, nor an item of proof, speaks directly in support of the contention that undue influence actually prompted the deed. True, it is insisted that the old gentleman was cared for, entertained, dined, caressed, and all that, by those at Lynnside, for quite a period of time prior to his making the will and deed, but are we to assume that all this caused the execution of these papers, and that, because of it, the deed was not the voluntary act of the grantor? Certainly all that is proved as to the attention and kindness, pretended or otherwise, to this old man can be taken as true, and the whole of it be entirely consistent with the voluntary execution of the deed.

Nor can we give ear to the argument that the alleged unreasonableness of the act, the exclusion of the children more needful of the bounty than the one favored, has sufficient weight in relation to the establishment of undue influence. Much reliance is placed upon the fact that the deed was an unreasonable and an unnatural act; that it gave much to a

favored and able bodied son and left little to a paralytic daughter and an epileptic son. Weight is contended for this fact and that of extreme old age and accompanying mental weakness. But we must not forget that: "Mere weakness of understanding is no objection to a man's disposing of his own estate. Courts cannot measure people's capacities nor examine into the wisdom and prudence of their property dispositions. If a man be legally *compos mentis*, be he wise or unwise, he is the disposer of his own property, and his will stands as a reason for his actions. The test of legal capacity is said to be that the party is capable of recollecting the property he is about to dispose of, the manner of distributing it, and the objects of his bounty." 2 Minor's Institutes, (2nd ed.,) 572.

Was Dr. Woodville of sufficient mental capacity to make the deed? There is much opinion pro and con in the record upon this question. But the defined weight of the testimony is that he was not only of sufficient mental capacity to do so, but of strong mental vigor, and lively mental activity, for one of his age. It is not denied that he was always a man of strong will and mind, knowing his own mind, and not being easily persuaded from his convictions. And right in this connection there is a significant admission in one of the briefs of counsel for plaintiff. It is a frank statement, disclosing that upon this question of mental weakness even counsel for plaintiff is shaken by the preponderance of the proof. It is there said: "While the plaintiff is frank to admit that he did not show that Dr. Woodville was at all times, from the autumn of 1901 to April, 1902, incapable of making a deed or will, he did show that the mental powers of Dr. Woodville were noticeably failing." We concur in this, and say that at the most it is all that plaintiff has shown. But failing mental powers are not alone sufficient to invalidate the deed. As said by this Court in *Buckey* v. *Buckey, supra:* "A grantor in a deed may be extremely old, his understanding, memory, and mind enfeebled and weakened by age, and his action occasionally strange and eccentric, and he may not be able to transact many affairs of life, yet if his age has not rendered him imbecile, so that he does not know the nature

and effect of the deed, this does not invalidate the deed. If he be capable, at the time, to know the nature, character and effect of the particular act, that is sufficient to sustain it." While there is some suggestion in the testimony of strange and eccentric acts in piling rocks on the farm, and loss of memory at times, yet above and beyond this is the clear draft of the will, his clear transaction of many business matters with many different persons at and near the time of the execution of this deed, and, in fact, up until within a short time before his death in August, 1904. The evidence speaks out clearly that old age had by no means rendered him imbecile. We find him at the period of the few months surrounding the execution of the will and deed writing the clearest and most sensible letters, transacting business with tenants, evidencing a perfect knowledge at all times of what was going on in relation to his affairs, calculating and paying out money, to say nothing of the clear and firm mind disclosed by the terms, phraseology and diction of the will, written in his own hand, and the transactions in relation to the execution of the deed, the character of which, and what he desired in that regard, he related to his attorney, and, after a few days, sent a written memorandum, to be followed in the prepation of the deed, embracing the same details. This memorandum is undeniable evidence that he was capable of recollecting the property that he was about to dispose of, the manner in which he desired to dispose of it, and the party to whom he desired it to be conveyed. The opinions of witnesses who question the capacity of his mind are based upon no well defined facts, and are, indeed, shallow as compared with the written evidence that came from the pen of this man himself. We find him, shortly prior to the date of the making of the will, writing to a friend in Washington, evidently referring to the calamity that had befallen the nation by the assassination of its President, and not only using the most courteous, intelligent and sensible diction, but embodying two phrases of Latin, showing a fire of patriotism still existing in his bosom equalled only by the clear enlightenment that still existed in his mind. As has been observed in the argument of this case, we must doubt if there is an attorney connected with it, or a member

of the Court under whom its consideration comes, who has mental power to excel the productions from the pen of this man whose mental capacity is attacked and whose deed is sought to be overthrown.

Much has been said on behalf of plaintiff as to the testimony of the priest who was the spiritual adviser of Dr. Woodville, and perhaps the witness introduced by plaintiff most worthy of credence; but it must be observed that this reverend gentleman simply says it is probable, and that he could not say for certain, that in the latter part of 1901 and the earlier part of 1902 he was susceptible of influence in the disposition of his property by one in whom he had trust and confidence. And it is also much worthy of note that the same witness was asked if Dr. Woodville was not a remarkably intelligent and strong minded man, considering his age and infirmities, up to within three months of his death, and answered: "At times to my knowledge." Certain it is that this witness, or any other, does not say that at the time of the conveyance in question he was other than the same remarkably intelligent and strong minded man. "The time of the execution of the deed is the material or critical point of time to be considered upon the inquiry as to the grantor's capacity." *Delaplain* v. *Grubb, supra*. At such time he is not shown to have been other than that which the priest says, at times, to his knowledge, he was. True, this witness details some incidents of failure of recollection, and other witnesses speak of similar incidents. But, as stated in *Teter* v. *Teter, supra:* "Mere infirmity of mind and body is not sufficient to overcome the legal presumption of mental capacity in the grantor. In order to have such effect, the evidence must show that he did not have sufficient understanding to clearly comprehend the nature of the business he was transacting." Throughout all the evidence it is shown that this grantor had ample understanding to comprehend clearly the nature of the business he was transacting, and that he did so comprehend it.

Nowhere does it appear that the grantor was improperly solicited by any one to make this deed. The answer does admit that the young lady's uncle had to do with its making, in that he suggested it, but the case is wholly lacking in

proof that this uncle used any influence that was undue or improper. And, though reliance is placed upon the negotiations between this uncle and grantor, looking to the proposed marriage, and upon the validity of the consideration of marriage, in the argument for the grantee, we can only say that the deed needs no other consideration to support it than that expressed therein, and that expressed in the will preceding it, in view of the failure of plaintiff to show the undue influence alleged as a reason to annul it. Nothing more than suggestion or proposal on the part of the uncle is shown. This alone is not undue influence. The uncle simply stated what bounty he would give the young lady, in case the young man was provided for by his father. Was not this addressed to the judgment of Dr. Woodville? Was it an improper suggestion or proposal, and can we say that whatever influence the same had on the old gentleman was undue? Certainly not. As was laid down in the *Delaplain Case, supra:* "Suggestion and advice, addressed to the judgment, are not undue influence. Nor is a deed induced by an appeal on the score of gratitude, past kindness, or love or esteem, the result of undue influence." The last clause of this quotation is sufficient answer to the insistent argument that the deed was influenced by false notions imparted to the old man by others that his son was deserving of much for his gratitude and kindness in remaining with him in his old age. But, aside from this, it may well be noted that no proof establishes any appeal for the bounty bestowed by this deed. The mere fact is established that Dr. Woodville could have been appealed to unduly in this regard, because he was much in the company of the son and the family into which that son married. Such fact cannot overthrow the deed, which must be presumed to be valid until overthrown by stronger proof than mere opportunity to be unduly influenced to make it.

There is no showing of the taking away of the free will of grantor in the act of the making of the deed; and even yielding to the theory of urgent solicitation to make it in order to gratify the wish of the son to marry, and to consummate a union of the son with the young kinswoman of whom the old gentleman was exceedingly fond, or, taking the view so strongly insisted upon, that the young woman and her rel-

atives, and the son and grantee, had so selfishly importuned
the old doctor by attentions and kindness as practically to
alienate his affections from his other children, yet influence
resulting from affection and attachment or the mere desire
of gratifying the wishes of another, if the free agency of
the party is not impaired, does not affect the validity of the
act. *Greer* v. *Greer*, 9 Grat. 330. The evidence wholly
fails to prove that the making of the deed was not attended
with the consent of the grantor's will and understanding.
To set aside a deed for undue influence, it must be shown
that the party making it had no free will, but stood *in
vinculis*. It must appear that the influence was such as
wholly to destroy free agency of the grantor, and to sub-
stitute the will of another for his. *Delaplain* v. *Grubb*,
*supra*. The case before us is so lacking in proof of the
actual substitution of another's will for that of the grantor
in the deed assailed, as really to deserve no other com-
ment than that such lack exists. And it must not be
overlooked that the testimony of the attorney who was
called to write this deed, and the notary taking the ac-
knowledgment, strongly support its validity. This testi-
mony is entitled to peculiar weight. *Buckey* v. *Buckey*, *su-
pra;* and other cases.

Enough has been stated by us to justify the view we take
of this case. Discussion of many features advanced, we
omit, as being deemed by us immaterial and uncontrolling.
So impressed are we with the intelligence, dignity and gen-
tlemanly bearing of Dr. Woodville, as disclosed by the record,
throughout a long life of usefulness, and so mindful are we
of the pride so often displayed in his demeanor and language,
that it would seem desecration of an honored memory, in
which such as he should be held after life has ended,
to exhibit in the public record of this opinion much of
unfortunate disclosure of family affairs with which the
record teems.

The evidence being entirely insufficient to support the de-
cree of the circuit court, the same is reversed, and the plain-
tiff's bill is dismissed.

*Reversed.   Bill Dismissed.*