## STUMP et al. v. STURM et al.

### (Circuit Court of Appeals, Fourth Circuit.   October 1, 1918.)

### No. 1570.

1. DEEDS ⬅196(1)—PRESUMPTION—CAPACITY OF GRANTOR.
    The presumption of law is that the grantor in a deed was sane and competent to execute it at the time of its execution.
2. DEEDS ⬅68(3)—CAPACITY OF GRANTOR—OLD AGE.
    Old age is not of itself sufficient evidence of incapacity to make a deed, and if the grantor, though enfeebled, is capable of knowing the nature, character and effect of his act, that is sufficient to sustain it.
3. DEEDS ⬅211(1)—CAPACITY OF GRANTOR—EVIDENCE.
    The evidence of an officer taking the acknowledgment of a deed or of a person present at its execution is entitled to peculiar weight in considering the grantor's capacity.
4. DEEDS ⬅203—CAPACITY OF GRANTOR—TIME OF EXECUTION.
    The time of the execution of a deed is the material or critical point of time to be considered on the inquiry as to the grantor's capacity.
5. DEEDS ⬅72(1)—VALIDITY—"UNDUE INFLUENCE."
    Influence gained by kindness and affection will not be regarded as undue, if no imposition or fraud be practiced, but "undue influence," to avoid a deed, must be such as to override the grantor's will.
    [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Undue Influence.]
6. DEEDS ⬅211(4)—VALIDITY—UNDUE INFLUENCE—EVIDENCE.
    Evidence *held* insufficient to show that an aged grantor, who conveyed the bulk of his property to missionary societies was unduly influenced.
7. DEEDS ⬅211(1)—VALIDITY—CAPACITY.
    Evidence *held* insufficient to show that an aged man who conveyed the bulk of his estate to missionary societies lacked capacity.
8. RELIGIOUS SOCIETIES ⬅4—"CHURCH OR RELIGIOUS DENOMINATION."
    The home missionary society of a religious denomination *held* not a "church or religious denomination," within Const. W. Va. art. 6, § 47, declaring that no charter of incorporation shall be granted to any church or religious denomination.
9. RELIGIOUS SOCIETIES ⬅16—HOLDING OF REAL ESTATE.
    As Code W. Va. 1913, c. 54, § 30 (sec. 2929), allows any foreign corporation to hold property in the state, unless otherwise expressly provided, *held* that a mission society incorporated in foreign state might hold property in West Virginia despite the constitutional and statutory restrictions on churches and religious denominations.
10. CORPORATIONS ⬅631—GRANT OF CHARTER—PROHIBITION AGAINST FOREIGN CORPORATIONS.
    That a state does not provide for the granting of a charter to domestic corporations of certain character is not in the nature of a prohibition against foreign corporations created for such purpose.
11. RELIGIOUS SOCIETIES ⬅16—GIFTS—RIGHT TO ATTACK.
    Only the state can attack a gift to a foreign religious corporation as in violation of the public policy of the state as enunciated in Const. W. Va. art. 6, § 47.

Appeal from the District Court of the United States for the Northern District of West Virginia, at Clarksburg; Alston G. Dayton, Judge.

Bill by Drusa Sturm and others against John S. Stump and others. From a decree for complainants (239 Fed. 749), defendants appeal. Reversed and remanded, with instructions.

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

W. E. R. Byrne, of Charleston, W. Va., and O. E. Swartz, of Clarksburg, W. Va. (E. Bryan Templeman, of Clarksburg, W. Va., on the brief), for appellants.

R. F. Kidd, of Glenville, W. Va., and W. E. Haymond, of Sutton, W. Va. (Haymond & Fox and Alex. Dulin, all of Sutton, W. Va., and C. M. Bennett, of Glenville, W. Va., on the brief), for appellees.

Before PRITCHARD and WOODS, Circuit Judges, and McDOWELL, District Judge.

PRITCHARD, Circuit Judge. This is an appeal from the decree of the United States District Court for the Northern District of West Virginia, in a suit wherein Drusa Sturm et al. were complainants and John S. Stump et al. were defendants. The decree in question set aside a certain deed from Daniel Huffman to the American Baptist Home Mission Society, dated March 11, 1907, certain deed from Daniel Huffman to John S. Stump, dated September 20, 1909, and certain other deeds pertaining to the lands which are the subject-matter of the two conveyances in question. We will refer to the appellees as complainants hereinafter, and the appellants as defendants.

The complainants seek to set aside the conveyances in question on the ground that the grantor was mentally incapacitated to execute a valid deed for real estate, and insist that—

"At the time of the execution of the said two deeds, one to said society and the other to the said John S. Stump, the said John S. Stump particularly persuaded and unduly influenced the said Daniel Huffman to execute the same and each of them, and the said John S. Stump was present urging and procuring the said Daniel Huffman to execute said deeds, and because of the mental incapacity of the said Daniel Huffman and the influence aforesaid unduly exercised by the said John S. Stump upon him, the said supposed deeds were signed by the said Daniel Huffman," and because "the American Baptist Home Mission Society cannot accept conveyances of real estate in the state of West Virginia and could not at the date of said supposed deeds to it do so, or hold the same under the Constitution and laws of the state of West Virginia nor under the laws of the state of its creation."

It appears that Daniel Huffman died in Gilmer county in March, 1916, at the age of 94. He married prior to 1846, and his wife died in 1902. The children of his marriage were two daughters, one of whom, Drusa, married Charles Sturm, and is still living; the other married Cary Mollohan, and both she and her husband are dead, leaving children surviving them, Camden D. Mollohan, Josephone Mollohan, Losie Stump, and Darlie Bush. It further appears that Daniel Huffman was an industrious, frugal farmer and minister of the gospel of the Baptist Church, and accumulated a valuable estate, mostly realty, and worth approximately $50,000.

In November, 1910, the county court of Gilmer county adjudged him incompetent and appointed a committee to control his person and estate. It is insisted that on November 11, 1907, Huffman, "by deed, assumed to convey to the American Baptist Home Mission Society," a corporation of the state of New York, 384 acres, 532 acres, 100 acres, 100 acres, an undivided half in 10 acres, all the interest of the said Huffman in the oil and gas in 351 acres, all his interest in the

coal, oil and gas in 92 acres and 48 acres in Gilmer county; all the interest of the said Huffman in the oil and gas in 147 acres and 55 poles and 135 acres in Calhoun county and 66½ acres in Braxton county, in West Virginia. By the terms of this deed he reserved the use, possession and control of these properties, to take and have all rentals for oil and gas accruing from existing leases, to make other leases therefor and receive all rentals and profits therefrom for and during his life; and it is set forth that "this deed shall not take effect until after the death of said Huffman." The consideration for this conveyance, set forth on its face, is one dollar in hand paid, but in its closing paragraphs it sets forth a purpose on the part of Huffman, by will, to make specific legacies to certain natural persons, and stipulates that if the other estate of which he died seized proved insufficient to pay such legacies, then the grantee society should make good all such specific bequests or legacies, to the extent of not exceeding a maximum sum of $4,500; and to secure the fulfillment of this obligation a vendor's lien is retained.

On September 20, 1909, deceased executed another deed reciting the execution of the former deed to the Mission Society and setting forth that "a doubt has arisen whether or not the grantee in the deed aforesaid can take and hold real estate in the manner contemplated by the said deed," Huffman conveys the same land and oil, gas and coal interests to John S. Stump (who, it appears, was and is the state agent of the Mission Society) in consideration of $1 in hand paid "and other valuable considerations," to be by Stump "held, used and disposed of by him according to his own will and discretion, without right on the part of any one to call him to account for the said lands or interests in said lands, or any part thereof, except so far as necessary to make good the charges hereby created." The charges thereby created are then set forth to be the reservation of a life estate in the lands and interests, to receive the rents, issues and profits thereof for life, and to have any specific legacies bequeathed by the grantor in his will made good to the extent that the other property of which he may die seized fails to accomplish that purpose, up to a maximum sum of $4,500, to be paid by grantor's personal representative as soon as the deficit should be ascertained, and to secure such provision, vendor's lien is retained. This deed then closes with the clause:

"It is expressly understood between the parties hereto that this deed is not intended as a repudiation of the deed so made to the American Baptist Home Mission Society, and is only intended to pass title to the grantee herein in the event the first-mentioned deed shall be held to be void and to pass no title."

It further appears that on June 25, 1912, the Mission Society by deed conveyed to said John S. Stump all its right, title and interest in and to these lands, coal, oil and gas interests, in consideration of $1 in hand paid and his note for $10,000, upon condition that the grantee, Stump, should assume all the obligations, stipulations and agreements contained in Huffman's deed to the society; that interest on the $10,000 note should not begin to run until Huffman's death, after which the vendor's lien retained to secure it, upon default in payment,

might be enforced by sale of the lands but such proceeds of sale, whatever amounting to, should release and discharge the note in full. It is further stipulated in this deed that if the deed of November 11, 1907, to the society "shall, for any cause, be declared null and void by a court of the state of West Virginia, or of the United States, then and in that event" Stump shall "be released from any payment on account of the debt herein incurred, and said debt shall be deemed to be fully paid and discharged."

On April 11, 1916, immediately after Huffman's death, Stump and wife in consideration of the sum of $1 in hand paid, other valuable consideration acknowledged to have been received, and the assumption of payment of Stump's $10,000 note to the Missionary Society, conveyed all these lands and interests in coal, oil and gas to the Latin-American Improvement Association, Incorporated, a corporation formed under the provisions of the Business Corporation Law of New York by a certificate filed and recorded in the office of the secretary of state, in that state, on August 20, 1915.

Its certificate of incorporation sets forth the purpose of the corporation to be to acquire and improve real property, to sell and lease the same in any state in the United States, in Mexico or elsewhere. Its capital stock is limited to $1,000 of ten shares of the par value of $100, five of which are subscribed for by the five incorporators, one share each.

On the same day (11th April, 1916), it further appears that this Latin-American Improvement Association, Incorporated, executed to Stump a power of attorney, authorizing him to sell these lands and interests in lands, and collect the proceeds of sale, proceed at law and equity, employ counsel and do all things necessary to be done in the premises. For the purpose of assailing and having annulled the several conveyances and the power of attorney aforesaid, the surviving daughter and the children of Huffman's deceased daughter aforesaid, instituted this suit on May 13, 1916, in the circuit court of Gilmer county. The case was removed to the District Court upon the petitions of the American Baptist Home Mission Society and the Latin-American Improvement Association, Incorporated. The Mission Society and Improvement Company filed their joint and separate answer to the bill, and John S. Stump filed his answer thereto.

[1-7] First, we will consider the evidence upon which complainant relies to show that deeds in question should be set aside. Mr. W. E. Powell, the predecessor of John S. Stump as superintendent of the Home Mission Board in West Virginia, one of two individuals who, it is alleged, exercised undue influence upon the mind of the deceased, among other things wrote Huffman several letters. Such of the said letters as we deem material are as follows:

"Parkersburg, W. Va., Sept. 12, 1893.

"Rev. D. Huffman, Stumptown, W. Va.—My Dear Bro.: Your kind letter containing two checks, one for $102.93 for state and home missions, and the other for $2 for your J. & M. has come to hand. Please accept my sincere thanks for your promptness in this matter. I am sorry to see such a falling off. In 1891 your association gave $130.33; in 1892, $99.49; now only $89.38, a loss to our board of over $40 in two years. The indications now are that we are to have a debt of $800 to $1,000 as against $850 last year.

"If it is possible for you and Mrs. Huffman to do so, I hope you will send me a good personal gift any time before Oct. 5th. A good Baptist made his will last week. Has about $15,000 worth of property and remembered the Home Mission Society. I should be glad if you would deed a good farm to the American Baptist Home Mission Society—you keep and manage it as long as you live and turn over the rents each year if you wished to do so—My dear Bro. I hope you will remember both State and Home Missions, but as you cannot convey property by will for State Missions, but can for Home Missions, allow me to urge that you will not put this matter off. It will be too late soon. Please do soon what you wish to do along this line and let me know about it. Will come up to see you about it if necessary. Hope to see you at Charleston Oct. 10-13. With kindest regards to Mrs. Huffman, as well as yourself,

"I am yours truly, W. E. Powell."

"Parkersburg, W. Va., Jany. 6, 1894.

"Rev. Daniel Huffman, Stumptown, W. Va.: In answer to my letter to you some months since your wife sent me $10 for State Missions, and in it she said 'I have thought this might be my last opportunity to help in this good work.' Believing that both yourself and Mrs. Huffman, after providing for your children, will want to do a liberal part for the work of our dear Saviour, by leaving money or property by will, I inclose you an exact form of bequest as prepared by the Home Mission Society. Since our State Mission Board cannot receive and hold legacies under our W. Va. laws, you can will all to the Mission Society with the request that say, one-half, be for State Mission work in W. Va. Since life is so uncertain and as making a will does not in any way interfere with the use and control of your property, allow me to urge upon your prayerful attention, that you and Mrs. Huffman ask the Lord to direct you in this matter and that you make your will at the earliest day you can, and that you remember liberally the American Baptist Home Mission Society that has done so much for our beloved country and also for West Virginia Baptists. As soon as you decide about this matter I shall be glad to hear from you both. I am just getting over a long and hard siege of 'la grippe.' Praying that the Lord will bless you and guide you both with many years of useful work yet.

"I am yours truly, W. E. Powell.

"P. S.—I inclose 3 copies. Keep one and hand the others to persons who will likely be interested in this work and speak to them about it."

"Parkersburg, W. Va., Dec. 6, 1895.

"Rev. D. Huffman, Stumptown, W. Va.—Dear Bro.: I have some hope of getting $1,000 about the 18th and if so will be glad to let you have it. Please let me know at once if you will take it if I get it. I have been greatly disappointed in not getting this money sooner for you. If I should come up to see you about the 20th, will you be ready to close up your will and arrange for the legacy? Would it suit you to deed to the American Baptist Home Mission Society a farm or two? This might be better than to have it in a will that might be contested.

"Please let me hear from you.

"Yours very truly, W. E. Powell."

It will be observed that the first of these letters relates to certain checks sent by the deceased and his wife to the Mission Board, and also contains a reference to the fact that the amount sent from the Association to which deceased belonged for the years 1891–1892 showed a loss to the Board of over $40 in 2 years. He then suggests that the deceased and his wife send a gift any time prior to October 5th, and refers to the fact that a "good Baptist made his will last week." In the next letter Powell says, among other things:

" * * * Believing that both yourself and Mrs. Huffman, after providing for your children, will want to do a liberal part for the work of our dear

Saviour, by leaving money or property by will, I inclose you an exact form of bequest as prepared by the Home Mission Society."

Instead of showing that it was the purpose of Powell to influence the deceased to ignore the duty he owed to his children, he expressly says that "after providing for your children" he trusts he can see his way clear to do a liberal part for the mission work. He then refers to the good work that had been done in that section of the country, and further suggests that he would be glad to hear from him in regard to the matter.

Certainly these letters contain nothing that could be construed an attempt to exercise undue influence, but, on the other hand, indicate a purpose to cooperate with the deceased in doing what he might feel to be his duty as respects the mission cause.

The other letter relates to the same matter, and likewise contains no threat or inducement which could in any view of the case be construed as an attempt to have the deceased desist from that which he naturally desired to do, nor is there any suggestion contained therein, which, if adopted, would have been inconsistent with the desire and intention expressed by the deceased during his long and useful life.

We have also carefully considered the evidence which relates to the alleged improper conduct of John S. Stump, as respects this transaction. Stump, it appears, was also a minister of the Baptist Church and a nephew of the deceased.

The letters written by him were even more moderate than those written by Powell, and in the main relate to the condition of the mission work, its needs, etc. The first of these letters dated March 24, 1897, relates to a $500 note which according to a contract deceased had with a Mr. Thomas, would be due on April 15th. The writer, among other things, says he had arranged with Mr. Thomas to renew the old note and let it stand until they could secure the money to pay it.

In the letter of March 17, 1904, it is stated that the Home Mission Society would have a debt about the 31st of March of $48,000, then calls attention to the fact that the only way to prevent accumulation of this debt would be for the brethren to make extra contributions for the work during that month, but it contains no suggestion that it was even the duty of the deceased to contribute. The writer closes by saying:

" * * * During those three years the influx of foreigners has increased from about 500,000 to nearly 1,000,000 per year. In the face of this increasing need shall we lessen the mission force? It remains for the brethren to say. * * *"

These letters certainly contain no language calculated to unduly influence the deceased.

The letter of February 28, 1905, states that they were attempting to get up an endowment for four scholarships for high-grade men at Crozer Theological Seminary, the scholarships to be named in honor of four of the professors, and the only intimation as to what the deceased should or should not do is contained in the following statement:

" * * * I think that if you want to put some money into ministerial education this is as sure a place to have it used for only good men that I can

think of. * * * I hope you will want to have part with us in this movement."

The next letter, dated December 28, 1906, begins by saying:

"I inclose herewith the will which you asked me to send you."

If this letter means anything, it is that the deceased had requested him to send copy of will and that he had complied with the request.

The next letter, dated March 5, 1908, relates to what the writer terms the "Marshall note," to secure which the deceased had taken a deed of trust. The writer offers his services in the collection of same.

On September 20, 1909, Stump again writes his uncle, inclosing check for $25 to be credited to the William T. and Docia Marshall note, stating that they proposed to pay same at an early date, but if they failed to do so he would advertise and sell on deed of trust.

On December 27, 1909, he again writes his uncle, inclosing check for $25 to be credited to the William T. and Docia Marshall note.

The next letter was written on January 1, 1913, and is in the following language:

"Parkersburg, W. Va., Jan. 1, 1913.

"Rev. Daniel Huffman, Stumptown, W. Va.—My Dear Uncle: By some mistake you have been summoned to appear at Glenville on the 6th day of January to give testimony in a proceeding which I have started to prove that you were mentally competent to make the deeds you have made in the past. I am writing now to tell you that if you got such a summons it was a mistake for them to send it to you, and you don't need to come to Glenville on account of it. I should be very glad to have you there, but it would be out of the question for you to make that trip in the middle of the winter. It might result in your death.

"I hope you are as well as usual and trust you may get through the winter all right.

"Yours truly,                                    John S. Stump."

The above-quoted letter shows that Stump was confident that by fair trial he could show that deceased had been improperly adjudged insane, and was of the opinion three years thereafter that he was in every sense of the word mentally competent at the time of the execution of the deeds.

In the letter of June 7, 1902, Stump reminds deceased of the fact that his name had been dropped from the list of subscribers to the Home Mission Monthly, and, further, if the deceased so desired, he would place his name back on the list.

On the 26th of June, 1902, Stump again writes his uncle that he had renewed his subscription to the Monthly, paying for same to the fall of 1904. He concludes this letter by saying that he regrets to hear of the loneliness of his uncle.

On the 15th of September, 1905, he again writes Huffman a letter in regard to one that his uncle had written him on the 12th instant, in which the deceased had expressed a desire to see Stump and the corresponding secretary of the Home Mission Society about matters of business.

There is nothing contained in these letters which could be construed as an attempt on the part of Stump to unduly influence his uncle.

The letter of Oct. ( ) 1905, addressed to his uncle, relates to land

situated in Faulkner county, Ark., stating that he had written the clerk of the court asking about liens, judgments, taxes, etc., that might be against the lands, and as to the advance in the price of real estate in that section, etc., telling him that he would report as soon as he received the desired information from the clerk. He expressed the opinion to Huffman that it would be a mistake to sell the lands at that time.

The letter of November 17, 1905, also relates to these lands, but contains nothing material to the question involved in this controversy.

On November 23, 1905, after obtaining information in regard to the Arkansas lands, Stump writes his uncle in regard to same, stating, among other things, that the tract contained 156.84 acres, instead of 160 acres, as called for in the deed, also that taxes for 1905 would be due January 1, 1906, and asks if he should find out what the taxes amounted to and pay them. Then he refers to a certain mortgage on the property, and further states that "there is no oil there, but there is supposed to be coal, and that there is talk of a railroad being built." He then asks his uncle if he desires him to close up this matter by having the mortgage canceled, and, among other things, says:

"* * * Inasmuch as you want this to go eventually to missions, I think if I were you I would deed this land to the Home Mission Society and let them close the matter out in any way they can, and relieve you of further worry or trouble about it. If you think you ought to do that, return the deed to me and I will have a deed made out and sent back to you to sign up. It seems to me that you could not afford to be worried about it for all there is involved."

There is nothing contained in any of the foregoing letters that evidences a purpose to unduly influence the deceased. Indeed the writer, among other things says:

"*Inasmuch as you want this to go eventually to missions* [italics ours], I think if I were you I would deed this land to the Home Mission Society and let them close out the matter," etc.

A number of other letters appear in the record, but in the main they relate to business transactions in which deceased was interested, and where John S. Stump, who had been given a power of attorney to act for him, was attempting to settle and adjust his business. The deceased received these letters from the date mentioned up to the 29th of August, 1910.

In a letter dated December 1, 1908, in referring to a debt said to have been due the deceased by a man by the name of Burns, Huffman is requested to release Burns from this debt; Stump stating in this letter that he thought it would be good policy to do so, and says further:

"* * * I don't want you to do it against your will, but I have given you the views of two of your friends and my own opinion for your consideration."

In referring to other matters further on in this letter the writer says:

"If you think I was not justifiable in making that proposition, please say so at once and I will withdraw it."

This letter tends to refute the contention that Stump was endeavoring to unduly influence his uncle.

It appears that the deceased was dissatisfied with Stump's management of what was known as the Clarksburg suit, and in writing his uncle says:

"If you want me to do so, I will return your power of attorney as soon as you have settled with Mr. Linn and Mr. Bassel, and leave the whole management of your business in your hands."

It seems Messrs. Linn and Bassel were attorneys for the deceased. This letter, instead of indicating a purpose to unduly influence Huffman, shows that Stump was willing to relinquish any power or authority he might have had under the power of attorney.

The other letters are very much of the same tenor, and show nothing to support the contention of the complainant that the deceased was unduly influenced in executing the deeds.

Among other things, there is the deposition of Levi Huffman, brother of the deceased, which was offered in evidence by the defendants. Levi Huffman testified that he was 73 years of age, and that he was present when the deed was executed by Daniel Huffman to the American Baptist Home Mission Society dated November 11, 1907. He was asked:

"Q. Were you present when directions were given for the preparation of that deed? I will modify that question by asking you if any directions were given for the preparation of said deed in your presence, and, if so, by whom? A. I was; Daniel Huffman gave the directions."

He was also asked as to who were present when the deed was executed, and if any one retired at the time it was executed. In reply to the last part of the question he said: "John S. Stump." He was then asked to state the substance of the conversation with Daniel Huffman at that time, and he answered as follows:

"A. Daniel Huffman was asked if it was a volition of his own that he of his own will and accord had executed this deed, he said it was."

Levi Huffman was then asked if the deceased at that time gave any reason as to why he executed the deed. Deceased replied to the question by saying that—

"He had always had a deep interest in the mission cause, and that he desired his estate to go for that purpose, giving as a reason that he was a child of missions, and that he was converted and united with the church under the ministry of a missionary."

Deceased was then asked (according to Levi Huffman's testimony) as to whether John S. Stump had used any undue influence in securing the execution of the deed, and in testifying as to his brother's reply said: "My recollection is John S. had not." He was then asked as to the mental condition of the deceased at the time of the execution of the deed, as indicated by his action and demeanor, and in reply said: "So far as I was able to judge his mental condition was good." He was then asked how long prior to the execution of the deed his brother had contemplated devoting any part of his means to Home Mission work, and in response testified as follows:

"A. In 1899 he expressed himself to me that it was his purpose and desire.

"Q. Where did he so express himself? A. First, at his own home; secondly, in journeying to the home of our brother-in-law, William Barr, likewise after our arrival at Barr's home.

"Q. What part of his property did he indicate that he intended to dispose of in such a manner? A. All of his real estate reserving the oil, gas, and coal.

"Q. What, if anything, was said by him at the time respecting a provision for his descendants? A. That he had given to them about as much as he intended them to have. I might be mistaken as to his reserving the oil, gas, and coal for all time, but possibly during his life; but he intended it all at his death to go into the hands of the Home Mission Society.

"Q. Did he ever afterwards tell you anything more on the same subject, if so, and where? A. In the year 1907 he also expressed a desire to turn his real estate over into the hands of the Home Mission Society. * * *

"Q. What influence was exerted to secure them? A. I am not aware that there was any.

"Q. Is it not a fact for the last ten years Daniel Huffman has insisted that his property belonged to the Lord and when he was through with it should go to Him without regard to his own children and heirs? A. You put the question too strong. He intended after he had given to his children what he intended them to have the remainder should go to the Lord or His cause, that was his statement to me. * * *

"Q. Who asked these questions of Daniel Huffman? A. It might have been Hines and Kelly.

Q. Why did Hines and Kelly ask these questions? A. How do I know? I want to make a statement. Mr. Hines and Kelly asked Daniel Huffman if any one had influenced him to make this deed, his answer to them was that if they knew as much about him as Brother Levi did that he couldn't be influenced to do a thing he did not want to do. * * *"

Rev. W. M. Hall, a Baptist minister, testified in regard to having seen the deceased at Petersburg, Va., in 1906. In regard to what occurred on this occasion he stated:

"After dinner he told me he had been in town seeing about his business, and then I don't know what brought the subject up, but he told me that he had decided to turn his property over to the missions; that he had been thinking for some time of writing to Mr. Stump about it, that he had decided to turn his property fully into the hands of the Mission Board and that they were to pay him interest or something to that effect. He said he wished to close it out in full, so that there would be no lawsuit after he was dead. I will change that a little—that he intended to give all that he expected his children to have to them while he lived and was going to deed the rest to the missions. I suppose the conversation lasted half an hour. * * *"

Rev. Hall also testified that he considered the deceased at that time an exceptionally strong man for his age and that he never saw any indication of mental weakness and never heard any one comment on it.

John S. Stout testified that he was a farmer, lived at Cedarville, Gilmer county, and was 57 years of age. He said, among other things, that on one occasion Daniel Huffman had told him that he had deeded property to the Home Mission Society and had heard some talk that his heirs were going to give him trouble in regard to the matter, but he stated that he—

"had given it to the Home Mission Society that the gospel might be carried to the world and that he had not done as much along that line as he would like to but the Lord had blessed him in giving him means and he had turned it over so that his brethren might carry on the work."

This was in the spring of 1908, according to witness' recollection.

R. G. Linn, a practicing lawyer, testified that from time to time he was the legal adviser of the deceased and that he frequently consulted him about legal matters. In response to the question as to Huffman's mental condition he said: "I believe it to be good." When asked as to the deceased being able to understand papers of that character he testified:

"* * * He asked me—the paper was read over to him carefully and he asked me to read again the boundaries, or part of them, for the purpose of determining for himself whether or not it respected the reservation that he had made in some former deed."

Linn was then asked:

"Q. From that conversation you had with him upon that day would you say that he did or did not understand what property he had and what property was embraced in that deed? A. Why I believe that he understood, and I believed at the time that he did."

Sylvester Stump was also introduced and stated that he was 72 years old and that he was a notary public in 1909, that he knew the deceased and was present when they were considering the matter of the deed to John S. Stump. He testified that Mr. Linn read one copy and gave the other to him to read to see if it was correct. He testified:

"After they got the deed signed I asked Mr. Huffman if he knew the contents of it. He says, 'Yes, I do,' and I certified his acknowledgment. From what I saw I thought Daniel Huffman's mental condition was good that day. Good as common. He was not excited. He talked intelligently. They talked the business they were interested in."

D. N. Connoly, a Baptist minister was introduced and testified that he had been acquainted with the deceased since "about 1894," having often met him at church and other places. Among other things he said:

"I also saw him in 1911 on Kanawha river near the mouth of Mill Run. I was preaching around there. When I first spoke to him he says, 'I don't recognize you,' and then he stopped a moment and says, 'I believe I know the voice; I believe it is Brother Connoly.' I said, 'Yes, it is Brother Connoly.' And then he remarked to me that he couldn't see clearly."

He also testified that he detected nothing wrong with his mental condition at that time.

A number of other witnesses were introduced, practically all of whom testified that the deceased was a man of strong mentality, and the most of them stated that they had heard him express a desire and purpose to give his property, after providing for his children, to the mission cause.

The test by which the validity of the disposition of property depends is whether the donor or devisor, at the time of execution of the deed, or will, knew what he was doing, the property of which he was making disposition, its relation to his estate, its effect upon his relatives to whom the property for which he was making conveyances would, upon his death, descend, and the use to which it was to be put. If these

254 F.—35

conditions are found to exist the grantor is deemed to be competent and such deed, or will, should not be disturbed by the courts, in the absence of controlling evidence of undue or coercive influence over his mind and conduct at the time of the execution of the instrument.

In other words, if the deceased in this instance executed the deeds in question of his own volition and without being unduly influenced, so as to cause him to do that which he would not ordinarily have done under normal conditions, then and in that event this court, following a long line of decisions, would not be inclined to grant the relief sought by the complainants.

A careful consideration of the evidence discloses the fact that the deceased for the greater part of his life was considered a substantial farmer, possessing to an unusual degree those traits that give one success in life, to wit, energy, economy, good judgment, and uprightness in business dealings. It appears that he was a man of strong convictions, and this was especially true as to religious matters. The evidence further shows that he was not only a consistent member of the denomination to which he belonged, but that he spent much of his time in preaching the gospel and contributed to the cause in which he was so deeply interested; further, that for years prior to the execution of the deeds in question he contemplated making substantial contributions to the cause of missions before his death.

It is insisted that letters written by W. E. Powell and John S. Stump to the deceased were what might be termed "begging letters." An agent or agents of a Christian enterprise may properly appeal to those able and in sympathy with such enterprise for financial support. In this age of enlightenment the number of men of large means, as well as those of moderate means, who, from year to year, contribute to enterprises of this character, is rapidly increasing. Indeed, a majority of the educational institutions of this country, and certainly a majority of the religious institutions, are based upon endowments made by those who feel that it is their duty to dispose of their means by contributing to educational and religious institutions. These are laudable objects and it seems to us in a case like the one at bar, where one from his early manhood has spent his life in rendering Christian service, being imbued with a desire to not only preach the gospel to his own people, but to carry it to others, expressing at all times his purpose to make substantial contributions to the cause of missions, at a time when he was unquestionably in full possession of his mental and physical faculties and continued until his death to so express himself, tends strongly to show that what he did was not on account of undue influence, but was only the fulfillment of his long cherished and expressed desire.

It should be borne in mind that, in addition to what we have said as to the testimony offered, tending to establish the mental capacity of the deceased, that the court below found as a fact that the complainants had not established the mental incapacity of the deceased to execute the deeds in question. The court, in referring to this phase of the question, said:

"I think the evidence does rebut the contention of senile dementia or incapacity to convey. While he was 85 years old in 1907, and his memory was

falling, I do not doubt his ability then to understand to the full degree required by the law, as enunciated in Buckey v. Buckey, 38 W. Va. 168 [18 S. E. 383], and similar cases, the nature and effect of a contract of sale."

There are a number of cases bearing upon this subject, and in the case of Buckey v. Buckey, 38 W. Va. 168, 18 S. E. 383, the court announced the following:

"The presumption of law is that the grantor in a deed was sane and competent to execute it at the time of its execution.

"Old age is not of itself sufficient evidence of incapacity to make a deed.

"The evidence of an officer taking the acknowledgment to a deed, or of a person present at its execution, is entitled to peculiar weight in considering the grantor's capacity.

"The time of the execution of a deed is the material or critical point of time to be considered upon the inquiry as to the grantor's capacity.

"A grantor in a deed may be extremely old, his understanding, memory, and mind enfeebled and weakened by age, and his action occasionally strange and eccentric, and he may not be able to transact many affairs of life; yet if age has not rendered him imbecile, so that he does not know the nature and effect of the deed, this does not invalidate the deed. If he be capable, at the time, to know the nature, character, and effect of the particular act, that is sufficient to sustain it."

The rule announced in the above case was reaffirmed in a number of cases in West Virginia, as follows: Delaplain v. Grubb, 44 W. Va. 612, 30 S. E. 201, 67 Am. St. Rep. 788; Farnsworth v. Noffsinger, 46 W. Va. 410, 33 S. E. 246; Teter v. Teter, 59 W. Va. 449, 53 S. E. 779; Bade v. Feay, 63 W. Va. 166, 61 S. E. 348; Woodville v. Woodville, 63 W. Va. 286, 60 S. E. 140; Black v. Post, 67 W. Va. 253, 67 S. E. 1072; Barnett v. Breathouse, 77 W. Va. 514, 88 S. E. 1013.

The case of Mackall v. Mackall, 135 U. S. 172, 10 Sup. Ct. 707, 34 L. Ed. 84, in referring to this phase of the question says:

"Influence gained by kindness and affection will not be regarded as 'undue,' if no imposition or fraud be practiced, even though it induce the testator to make an unequal and unjust disposition of his property in favor of those who have contributed to his comfort and ministered to his wants, if such disposition is voluntarily made. Matter of Gleespin's Will, 26 N. J. Eq. 523. * * * Confidential relations existing between the testator and beneficiary do not alone furnish any presumption of undue influence. Lee v. Lee, 71 N. C. 139. Nor does the fact that the testator on his death-bed was surrounded by beneficiaries in his will. Bundy v. McKnight, 48 Ind. 502. * * * Nor that the testator, an old and helpless man, made his will in favor of a son who had for years cared for him and attended to his business affairs, his other children having forsaken him. Elliott's Will, 2 J. J. Marsh. 340; s. c. Redf. Am. Cas. on Wills, 434. * * * It would be a great reproach to the law if, in its jealous watchfulness over the freedom of testamentary disposition, it should deprive age and infirmity of the kindly ministrations of affection, or of the power of rewarding those who bestow them.

"Undue influence must destroy free agency. It is well settled that in order to avoid a will on the ground of undue influence, it must appear that the testator's free agency was destroyed, and that his will was overborne by excessive importunity, imposition or fraud, so that the will does not, in fact, express his wishes as to the disposition of his property, but those of the person exercising the influence."

In the case of Du Bose v. Kell, 90 S. C. 196, 71 S. E. 371, the Supreme Court said:

"To avoid a deed on the ground of undue influence, the evidence must show such an influence exerted on the grantor as to override his will and to make the act of executing the deed a mere mechanical performance by him of the design of the person exerting the influence, and undue influence may consist in any influence which is so far operative as to destroy free agency."

The whole subject of undue influence and mental competency is fully and elaborately discussed by Hawley, District Judge, in the authorities cited in President, etc., of Bowdoin College et al. v. Merritt et al. (C. C.) 75 Fed. 480. The discussion on this point is so full, and the citation of authorities so complete, that hardly anything can be added to it. The law on the subject is also admirably stated by Judge Sanborn in a Circuit Court of Appeals opinion. Sawyer v. White, 122 Fed. 223, 58 C. C. A. 587.

It is true that Daniel Huffman was forgetful in the latter part of his life, sometimes not knowing even those with whom he had acquaintance. There is also evidence that he was sometimes confused about the details of his business, such, for example, as whether notes had been paid—what he had done with some money which he had. But this confusion was always temporary, and he grasped and recognized the force of the evidence which was brought to him that he was mistaken as to his former views. Some of his neighbors testified that in their opinion, based on this confusion as to details of his business and the failure to recognize those whom he knew, that he was not of sound mind and incapable of making a valid deed. On the other hand, many who had intimate acquaintance with him, including two of his brothers, testified that he knew his property; that he had distinct purposes and ends in life, which were not irrational or fantastic, but, on the contrary, such as might well be entertained by an intelligent man. As we have stated those who were present at the time of the execution of the deed, including lawyers of the highest character, testified that he fully apprehended the nature of his property and the purport of the deed he was making, and aided in getting data for the preparation of the deed. The conclusion, therefore, of the District Judge that Huffman was not of unsound mind and had sufficient intelligence to fully realize what he was doing, is well sustained by the greater weight of the testimony.

There was no undue influence. It is true that several Baptist clergymen, deeply interested in the cause of missions, encouraged and solicited Huffman to carry out the purpose which he had formed, and not to delay it until it was too late. But there was not the slightest evidence that any pressure was brought to bear upon him. There is no evidence that he was told that the failure to make these deeds to carry out his design would affect his welfare in this world or the next. The only appeals made were that he should aid a good cause in pursuance of the design which he had expressed without any solicitation from anybody. When he went to make the deeds, Huffman himself requested his brothers to accompany him, and the papers were drawn by lawyers of high standing, after much discussion as to the form the transaction should take. Everything was done openly and above board. There was no necessity for effort to bring Huffman to a frame of mind which would conduce to the giving of his property to a missionary

cause. He had been in that frame of mind for years, and we can discover no effort to control his will in this regard. The most that can be said as to the influence upon him was that he was requested and solicited to carry out the design without delay. But even this request was not unduly insistent, for as soon as it was made he agreed to the suggestion.

In view of all the facts in this case we are of the opinion that the case at bar is far removed from the standard of proof required to set aside conveyance, even for undue influence, or incompetency, or both.

[8, 9] However, it is insisted by counsel for the complainant that the deeds of 1907 and 1909 are invalid, in that they are contrary to the laws and policy of the state of West Virginia; in other words, after assuming the invalidity of the deeds in question upon this ground, they then arrive at the conclusion that no title passed to the grantor thereunder.

The court below in referring to this phase of the question, among other things, said:

"Personally, my views have been in accord with those of counsel in this line of reasoning, as shown by the two opinions filed in Miller v. Ahrens (C. C.) 150 Fed. 644, and [Id. (C. C.)] 163 Fed. 870; but I hesitate, in view of the opinion rendered in Pulp & Paper Co. v. Miller, supra [176 Fed. 284, 100 C. C. A. 176] by the Circuit Court of Appeals for this circuit, to rely upon them in the decision of this case. * * *

"The conclusions I reach are these: I think these conveyances are direct violation of the statute of West Virginia, limiting the amount and the purposes for which church organizations may take real estate. If, however, the ruling in West Va. Pulp & Paper Co. v. Miller, supra, is held decisive that only the state can complain of this, I am fully convinced that they should be set aside, at the instance of these heirs, because of the undue influence that caused their execution, and decree to that effect may be entered."

The Constitution of West Virginia (article 6, § 47) says:

"No charter of incorporation shall be granted to any church or religious denomination. Provisions may be made by general laws for securing the title to church property, and for the sale and transfer thereof, so that it shall be held, used, or transferred for the purposes of such church or religious denomination."

Counsel for the complainants say that—

"The provision made by general law, under the last clause of the above section of the Constitution, is chapter 57 of the Code of West Virginia; and it provides that the circuit court of the county shall appoint trustees to hold church property, and section 7 of that chapter [sec. 3299] provides that such trustees may take and hold for the purposes mentioned in the first section of said chapter, not exceeding four acres of lands in an incorporated city, town or village, and not exceeding 60 acres out of such city, town or village."

"This chapter makes provision in relation to the conveyances of land which shall be made for use or benefit of any church, religious sect, society, congregation or denomination as a place of public worship or a burial place or as a residence for a minister and provides that the land shall be held for such purpose and no other."

"Our [complainants'] contention is that this statute has no relation to the subject under discussion in this case. A church of any denomination has the right, under this statute, made in pursuance of the Constitution to take and hold real estate for church purposes locally to the extent "provided in section 7, but this by no means authorizes the incorporation of a company to take the land for any purposes connected with the church or religious denomination."

The contention of the complainants is based upon the assumption that the American Baptist Home Mission Society is a "church or religious denomination," within the meaning of the section of the Constitution above quoted. We think there is a marked distinction between a "church or religious denomination" and a society or other organization acting as an auxiliary thereto.

In the case of Gilmer v. Stone, 120 U. S. 586, 7 Sup. Ct. 689, 30 L. Ed. 734, the Supreme Court passed upon the validity of a devise of several hundred acres of land situated in the state of Illinois, to be "equally divided between the Board of Foreign and the Board of Home Missions" of the Presbyterian church, both being New York corporations. The Illinois statute provides that "a congregation, formed for religious purposes," cannot purchase or hold land in excess of 10 acres. Among other things it appears that the corporate beneficiaries were formed—

"for the purpose of establishing and conducting Christian missions among the unevangelized of pagan nations and the general diffusion of Christianity, and to assist in sustaining the preaching of the gospel in feeble churches and congregations in connection with the Presbyterian Church in the United States, and generally to superintend the whole of the Home Missions in behalf of such church."

In that case the Supreme Court held that the Illinois statute was applicable to bodies formed for the purpose of religious worship and did not apply to these mission societies and the devise of land to them was allowed to stand. The Supreme Court in that case in referring to this point said:

"While these boards are important agencies in aid of the general religious work of the Presbyterian Church in the United States of America, neither of them is, in any proper sense, or in the meaning of the 35th section of the act of 1872, a church, congregation or society formed for the purpose of religious worship. The counsel for the plaintiff in error seem to lay stress upon the more general words, 'formed for religious purposes,' in the forty-second section of the act; but manifestly the other parts of the same section, and previous sections, show that the only corporations intended to be restricted in the ownership of land to ten acres, were those formed for the * * * commonly called benevolent or missionary societies. The reasons of public policy which restrict societies, formed for the purpose of religious worship, in their ownership of real estate, do not apply at all, or, if at all, only with diminished force, to corporations which have no ecclesiastical control of those engaged in religious worship, and cannot prescribe the forms of such worship, nor subject to ecclesiastical discipline those who fail to conform to the rules, usages, or orders of the religious society of which they are members."

In the case of Hamsher v. Hamsher, 132 Ill. 285, 23 N. E. 1125, 8 L. R. A. 558, there was a gift by will to the Young Men's Christian Association of Decatur, Ill., a corporation formed for the purpose of promoting, as shown by its charter, educational, humanitarian and charitable work, rather than religious worship. The Supreme Court of that state, in passing upon this question, among other things said:

"It does not appear that the Young Men's Christian Association of Decatur, Ill., exercises any ecclesiastical control over its members, or prescribes any form of worship for them, or subjects those who fail to conform to its rules to ecclesiastical discipline. Therefore a limitation upon the extent of

its ownership of real estate is not so imperatively demanded by those considerations of public policy which apply to corporations formed for the purpose of public worship. We are of the opinion that said association is not subject to the restriction contained in section 42 of the Corporation Act, and that the devise to it of a greater quantity of land than ten acres is not invalid. It follows that the appellant takes nothing as heir, and that his cross-bill was properly dismissed."

It is undoubtedly true that the Constitution of West Virginia prohibits the incorporation of any church or religious denomination, but we are of the opinion that this provision applies only to church or religious denominations and cannot be properly construed as applying to organizations of the character involved in this controversy, nor does it contain any inhibition against a foreign corporation created, among other things, for the purpose of taking and holding real estate. Under the provisions of section 30 of chapter 54 of the Code of West Virginia (sec. 2929) any foreign corporation may hold property in that state unless otherwise expressly provided.

In the case of Fritts v. Palmer, 132 U. S. 283, 10 Sup. Ct. 93, 33 L. Ed. 317, the Supreme Court said:

"The Constitution and laws of Colorado, it should be observed, do not prohibit foreign corporations altogether from purchasing or holding real estate within its limits. They do not declare absolutely or wholly void, as to all persons, and for every purpose, a conveyance of real estate to a foreign corporation which has not previously done what is required before it can rightfully carry on business in the state. Nor do they declare that the title to such property shall remain in the grantor, despite his conveyance. * * *

"If the Legislature had intended to declare that no title should pass under a conveyance to a foreign corporation purchasing real estate before it acquires the right to engage in business in the state, and that such a conveyance should be an absolute nullity as between the grantor and grantee, leaving the grantor to deal with the property as if he had never sold it, that intention would have been clearly manifested. * * *

"To the above cases may be added those holding that an alien may take by deed or devise and hold against any one but the sovereign until office found. Cross v. De Valle, 1 Wall. 1, 13 [17 L. Ed. 515]; Governeur v. Robertson, 11 Wheat. 332 [6 L. Ed. 488]; National Bank v. Matthews, 98 U. S. 621, 628 [25 L. Ed. 188]; Phillips v. Moore, 100 U. S. 208 [25 L. Ed. 603]. Also, those holding that the question whether a corporation, having capacity to purchase and hold real estate for certain defined purposes, or in certain quantities, has taken title to real estate for purposes not authorized by law, or in excess of the quantity permitted by its charter, concerns only the state within whose limits the property is situated. It cannot be raised collaterally by private persons unless there be something in the statute expressly or by necessary implication authorizing them to do so. Cowell v. Springs Company, 100 U. S. 55, 60 [25 L. Ed. 547]; Jones v. Habersham, 107 U. S. 174, 188 [2 Sup. Ct. 336, 27 L. Ed. 401]."

[10] We are further of the opinion that where a state does not provide for the granting of a charter to domestic corporations of certain character, such nonaction on its part is not in the nature of a prohibition against foreign corporations created for such purpose.

[11] We think the third proposition, that under the laws of West Virginia a foreign corporation will be deemed to have no corporate existence is untenable in the light of the cases decided by the Supreme Court of West Virginia, and those decided by the federal courts in cases arising upon gifts or grants made in West Virginia; also, this

principle has been announced by the Supreme Court of the state of Virginia, whose laws in many respects are similar to the provisions of the Constitution of West Virginia. In the case of West Virginia Pulp & Paper Co. v. Miller, 176 Fed. 284, 100 C. C. A. 176, the court in referring to this point said: There was a devise in trust of lands in West Virginia to a church incorporated under the laws of Maryland. In that case the corporate existence of the Maryland church was recognized by the court; it holding, among other things, that in the case of devise of land to a foreign church, such devise could only be called in question by the state. In that case the court said in point:

"Even if this were a devise of land to a foreign church, the state alone could complain. In the case of Church v. Arkle, 49 W. Va. 93, 38 S. E. 486, the court said: 'Where one leases a lot from the trustees of a church in an action of unlawful detainer against him by such trustees for the recovery of possession, he cannot set up that the church holds the lot in violation of section 1, c. 57, of the Code, limiting the ownership of real estate by a church to such as may be necessary as a place of public worship or burial place, or the residence of a minister. None but the state can attack such ownership as violating that statute.' Banks v. Poitiaux, 3 Rand. (Va.) 136, 15 Am. Dec. 706; Hanson v. Little Sisters of the Poor, 79 Md. 434, 32 Atl. 1052, 32 L. R. A. 293.

"Also in the case of Jones v. Habersham, 107 U. S. 174, 2 Sup. Ct. 336, 27 L. Ed. 401, the court, in referring to this question, said: 'But there are two conclusive answers to this argument: (1) Restrictions imposed by the charter of a corporation upon the amount of property that it may hold cannot be taken advantage of collaterally by private persons, but only in a direct proceeding by the state which created it. Runyan v. Coster, 14 Pet. 122, 131 [10 L. Ed. 382]; Smith v. Sheeley, 12 Wall. 358, 361 [20 L. Ed. 430]; Bogardus v. Trinity Church, 4 Sandf. Ch. (N. Y.) 633, 758; De Camp v. Dobbins, 29 N. J. Eq. 36; Davis v. Old Colony R. R. Co., 131 Mass. 258, 273 [41 Am. Rep. 221].'

"In the case of Julian v. Central Trust Co., 115 Fed. 956, 53 C. C. A. 438, it was insisted that the Southern Railway Company, being a corporation of the state of Virginia, could not hold railroad property in North Carolina, and, in referring to this phase of the question, the court, among other things, said: 'If the Southern Railway Company holds this property contrary to the will of the sovereign power of the state, it is for the state to interfere. No private individual can usurp its prerogative. Bank v. Matthews, 98 U. S. 628, 25 L. Ed. 188; Leazure v. Hillegas, 7 Serg. & R. (Pa.) 313.'

"In the case of Hickory Farm Oil Co. v. Buffalo, N. Y. & P. R. Co. (C. C.) 32 Fed. 22, the court said: 'The leading case in Pennsylvania on the subject of the effect of a conveyance of real estate to a corporation forbidden by law to "purchase and hold" the same is that of Leazure v. Hillegas, 7 Serg. & R. [Pa.] 313, in which it was held that such corporation might purchase and take title to the real estate; its title, however, like that of an alien, being defeasible at the pleasure of the commonwealth. That case and the later case of Goundie v. Water Co., 7 Pa. 233, settle the principle that the commonwealth alone can object to a want of capacity in a corporation to hold land.' "

The case of Mallett v. Simpson, 94 N. C. 37, 55 Am. Rep. 594, is to the same effect. Also, in the case of Ragan v. McElroy, 98 Mo. 349, 11 S. W. 735, the Supreme Court held that whether a corporation, in accepting deed to real estate, exceeded its powers, is a question which could only be raised by the state in direct attack.

In the case of Wilson v. Perry, 29 W. Va. 169, 1 S. E. 302, there was a bequest in trust to the Presbyterian Committee of Publication, a Virginia corporation, formed for "the dissemination of religious

truths" and the Supreme Court of that state upheld the gift. In the case of Ross v. Kiger, 42 Va. 402, 26 S. E. 193, a bequest to the "Mission Society of the Methodist Episcopal Church," a New York corporation, was sustained.

The following cases are very much in point and sustain the contention of the defendant: Chambers v. City of St. Louis, 29 Mo. 543; American Mortgage Co. v. Tennille, 87 Ga. 28, 13 S. E. 158, 12 L. R. A. 529; Union National Bank v. Matthews, 98 U. S. 621, 25 L. Ed. 188.

In the latter case, the Supreme Court, among other things said:

"Where a corporation is incompetent by its charter to take a title to real estate, a conveyance to it is not void, but only voidable, and the sovereign alone can object. It is valid until assailed in a direct proceeding instituted for that purpose."

After carefully considering the provisions of the West Virginia Constitution, in the light of the foregoing authorities, we are of the opinion that (a) the American Baptist Home Mission Society and the Latin-American Improvement Association, Incorporated, are not religious denominations within the meaning of the act; (b) that there is no provision in the West Virginia Constitution that inhibits a foreign corporation from holding property within that state; (c) that this court in the case of the West Virginia Pulp & Paper Co. v. Miller (supra), established the rule, in this circuit at least, that in a case like the one at bar the state alone can attack the validity of an instrument alleged to be in violation of the public policy of the state as annunciated in the Constitution.

In view of what we have said we are of the opinion that the court below was in error in holding the deeds in question to be invalid, therefore, the decree of the court below is reversed and the case will be remanded, with instructions for further proceedings in accordance with the views herein expressed.

Reversed.